**Robert DRAHEIM, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 04–94–00039–CR.**

Court of Appeals of Texas,
San Antonio.

Jan. 24, 1996.

Robert Switzer, Switzer, Carroll & De Prado, San Antonio, for Appellant.

Edward F. Shaughnessy, III, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before LÓPEZ, GREEN and DUNCAN, JJ.

## OPINION

DUNCAN, Justice.

Robert Draheim pleaded guilty to a jury and was convicted of aggravated sexual assault and indecency with a child. For the offense of aggravated sexual assault, the jury assessed ninety-nine years in the Institutional Division of the Texas Department of Criminal Justice. For the offense of indecency with a child, the jury assessed twenty years in prison. In two points of error, Draheim complains that the trial court erred in admitting and excluding certain evidence in his sentencing trial. In his third point of error, Draheim alleges fundamental error arising out of the State's repeated references to the hardships endured by the jury, the State, and the State's witnesses as a result of Draheim's exercising his right to trial by jury. We affirm.

### FACTS

In June 1988, eleven year old E.S. moved in with her father, J.S. During the late summer and early fall of that year, J.S. frequently took his daughter with him to his construction job at the home of his friend, Robert Draheim. Draheim's home was a "kid's dream," complete with video games, pinball and slot machines, a pool table, and snacks. On October 10, when J.S. again took his daughter to Draheim's, Draheim invited E.S. into his bedroom, which was equipped with a waterbed, mirrors on the ceiling and walls, a video camera, and a TV monitor. After E.S. entered the bedroom, Draheim closed the door. On the bed were wrapped birthday presents for E.S., who had just turned twelve.

With a camera running, E.S. opened the presents, which contained clothes. At Draheim's invitation, E.S. modeled the clothes, changing in the adjacent bathroom. After about an hour, E.S.'s father poked his head in and said he would return for E.S. the following day. Ultimately, throughout the evening and again the next morning until about noon, Draheim repeatedly performed oral, digital, and vaginal sex with E.S. Throughout the episode, Draheim had an erection; when E.S. masturbated him, Draheim ejaculated. After approximately an hour and forty-five minutes, the videotape was full and stopped recording. Draheim also took still Polaroid photographs.

When E.S.'s father picked E.S. up the next afternoon, he insisted on watching the videotape, which Draheim permitted. During the next four months, E.S. continued to see Draheim. Throughout that time, Draheim never apologized to E.S., nor did he say he had done anything wrong. To the contrary, both Draheim and later E.S.'s father told her not to tell anyone what had happened.

In February 1989, E.S. moved back in with her mother, M.S. On the evening of her return, E.S. related to her mother what had happened. M.S. reported the matter to the police, who proceeded to investigate. In May 1989, the District Attorney's office filed charges against Draheim for aggravated sexual assault and indecency with a child. The videotape had not been found, however, and Draheim denied any involvement. But on October 2, 1989, Crime Stoppers received the videotape in a package with no return address.

Shortly before his first trial, in June 1990, Draheim began seeing a counselor, Mark Steeg. When Draheim pleaded guilty, Steeg recommended probation. Steeg's recommendation was rejected, and Draheim was sentenced to prison by the court. Dissatisfied with his sentence, Draheim filed a writ of habeas corpus.

While his writ of habeas corpus was pending, in June 1991, Draheim agreed to testify against his co-defendant, J.S., who had pleaded not guilty, in exchange for the State's agreement not to use his testimony in any subsequent retrial Draheim might win as a result of his habeas corpus proceeding. It was the prosecutor's understanding that Draheim would not agree to testify against J.S. without use immunity. In preparation for his testimony, Draheim reviewed the video-

tape both inside and outside the jury's presence. When viewing the videotape outside the jury's presence, during lunch, Draheim ate his entire lunch, expressing no remorse or other emotion. When viewing the videotape before the jury, however, Draheim held his head down, with his hand over his face, and peeked at the videotape through his fingers.

In July 1993, Draheim's writ of habeas corpus was granted, and he was released from prison. Upon his release, Draheim was again evaluated by Steeg. Steeg's evaluation established that Draheim was still most sexually aroused by children ages ten to thirteen; the second highest category was fourteen-year-old girls; the third highest category was male children aged four to six and seven to nine. At the request of his attorney, Draheim was also evaluated by Dr. Michael Arambula. With Draheim's permission, on October 15, 1993—approximately two weeks before trial—Arambula put Draheim on Depo–Provera to reduce his testosterone and, therefore, arousal levels. By the time of trial, Draheim exhibited insignificant levels of arousal by any category. However, neither Steeg nor Arambula could say that Draheim would not offend again or that he would stay on the Depo–Provera.

On retrial, Draheim again filed an application for probation. This time, however, Draheim pleaded guilty to, and elected sentencing by, the jury. The State showed the videotape to the jury and introduced the testimony of seven witnesses:

- Patty Walsh, Douglas Stockton, Richard Garcia, and Gene Henderson—These law enforcement officers testified to Crime Stopper's receipt of the videotape, its authenticity, and their identification of Draheim and E.S.
- E.S.'s mother, M.S.—M.S. testified to E.S.'s outcry to her in February 1989 and E.S.'s behavioral and emotional problems, and counseling, since Draheim's assault in October 1988 and since being notified in July 1993 that she and E.S. would need to return to San Antonio to testify in the retrial.
- E.S.—E.S. testified to Draheim's assault and her behavioral and emotional problems, and counseling, since Draheim's assault in October 1988 and since being notified in July 1993 that she would need to return to San Antonio to testify in the retrial. E.S. also testified that Draheim had never apologized to her, had never told her he had done anything wrong, and had never asked her forgiveness.

Draheim also introduced the testimony of seven witnesses:

- Catherine Babbitt—Ms. Babbitt, an assistant district attorney, testified to the use immunity granted to Draheim in exchange for his agreement to testify against E.S.'s father, as well as Draheim's conduct while watching the videotape.
- Allyn Devey—Mr. Devey, a friend of Draheim's, testified that, while he had not watched the videotape, he believed Draheim had redeeming qualities and should be afforded a second chance.
- Fred Leisering—Mr. Leisering, the Deputy Chief of the Bexar County Community Supervision and Corrections Department, testified regarding the probation process and possible probation conditions.
- Mark W. Steeg—Dr. Steeg testified regarding Draheim's arousal levels, counseling process, and treatability in June 1990 and after his release from prison. Dr. Steeg recommended that Draheim be placed on probation and given a treatment package consisting of individual and group therapy and Depo–Provera.
- Michael R. Arambula—Dr. Arambula testified regarding Draheim's arousal levels and Depo–Provera treatment after his release from prison. Dr. Arambula's recommendation paralleled that of Dr. Steeg.
- Rebecca and Frank Ingersoll—The Ingersolls testified regarding their work in prison ministry, particularly with Draheim, and his religious conversion, which they believed to be sincere.

The jury returned a verdict rejecting probation and finding instead that Draheim should

be sentenced to ninety-nine years for aggravated sexual assault and twenty years for indecency with a child. The trial court sentenced Draheim in accordance with the jury's verdict.

## JURISDICTION

The State has not favored this court with a brief on the merits. Instead, the State relies solely upon its assertion that we do not have jurisdiction to consider Draheim's points of error because he waived all error—whether occurring before, at, and after the entry of his plea—by pleading guilty to the jury, rather than to the court. We disagree.

■ Under the *Helms* rule,[1] a nonnegotiated plea of guilty waives all nonjurisdictional errors occurring before the plea is entered. *Jack v. State*, 871 S.W.2d 741, 743 (Tex.Crim.App.1994). Such a plea does not, however, waive error alleged to have occurred at or after the plea. *Id.* at 744. "[A]n accused cannot waive a defect in proceedings that [has] not yet occurred." *Id.* at 743 (quoting *King v. State*, 687 S.W.2d 762, 767 (Tex.Crim.App.1985) (Clinton, J., concurring)). Therefore, in *Jack*, the Court of Criminal Appeals held that, despite Jack's nonnegotiated plea of guilty, the appellate court had jurisdiction to consider the merits of Jack's complaint that the trial court erred during his punishment trial by admitting evidence of unadjudicated extraneous offenses allegedly committed seventeen years before. *See Jack*, 871 S.W.2d at 744. In so doing, the court expressly rejected the State's principal argument in this case. *See id.* at 742–43 (rejecting State's assertion that *King* held that "nonnegotiated plea bargain waives all

nonjurisdictional defects, whether occurring prior to the entry of the plea or after").[2]

The State argues, however, that *Jack* has no application in this case because *Jack* involved a plea to the court, rather than a plea to the jury. Again, we disagree. For purposes of determining whether the defendant has waived the alleged error, the relevant distinction is between negotiated and nonnegotiated pleas, not between pleas to the court and pleas to the jury. *See Jack*, 871 S.W.2d at 743–44 ("we have reached the merits of asserted error in the *punishment* proceedings following nonnegotiated pleas of guilty ... See *Durham v. State*, 466 S.W.2d 758 (Tex.Cr.App.1971) (in nonnegotiated guilty plea before the jury, asserted error in failing to make punishment phase witnesses disclose source of their reputation testimony rejected on the merits)....").

Draheim alleges error occurring after a nonnegotiated guilty plea to the jury. Accordingly, pursuant to *Jack*, we hold that we possess jurisdiction to consider the merits of his complaints.

## IMPROPER DENIAL OF CROSS-EXAMINATION

Draheim first argues that the trial court erred in refusing to permit him to cross-examine E.S.'s mother, M.S., regarding other sexual offenses, committed against E.S. by other perpetrators, repeatedly and over the period of nearly a decade. Draheim argues that the testimony regarding these other offenses was relevant because it would have established that E.S.'s behavioral and emotional problems predated, and therefore were not entirely caused by, Draheim's conduct.[3] To exclude the testimony, Draheim asserts, left the jury with the erroneous impression

---

1. 484 S.W.2d 925 (Tex.Crim.App.1972).

2. The remaining cases cited by the State are likewise unavailing. *See Jack*, 871 S.W.2d at 743 (noting that it addressed merits of asserted error occurring at or after entry of a nonnegotiated plea in *Wheeler v. State*, 628 S.W.2d 800 (Tex. Crim.App.1982) (sufficiency of evidence to establish that guilty plea to jury taken in compliance with articles 1.15 and 26.13 of the Texas Code of Criminal Procedure); *Utsman v. State*, 485 S.W.2d 573 (Tex.Crim.App.1972) (denial of extension of time to file statement of facts)). *See also Carpenter v. State*, 477 S.W.2d 22 (Tex.Crim. App.1972) (admonishment before jury); *White v. State*, 475 S.W.2d 927 (Tex.Crim.App.1972) (con-

tinuance); *Morin v. State*, 682 S.W.2d 265 (Tex. Crim.App.1983) (instructed verdict, evidence of extraneous offense, definition in jury charge, sufficiency of evidence); *Brown v. State*, 487 S.W.2d 86 (Tex.Crim.App.1972) (evidence of extraneous offense); *Glenn v. State*, 442 S.W.2d 360 (Tex. Crim.App.1969) (evidence of prior criminal record and reputation evidence).

3. Q. [by the State] Now, after [the offense] was there anything in [E.S.] that was a change in her behavior from before June of 1988?

A. [by the witness M.S.] Yes, she was a little more violent. She had strong emotional outbursts. She became very physically violent towards me [and] her sister.

that all of E.S.'s behavioral and emotional problems and subsequent counseling were attributable exclusively to Draheim's assault.

### Standard of Review

 The scope of cross-examination is within the sound discretion of the trial judge.

Q. What sorts of things did you have to do after [E.S.] came back to live with you in February of 1988. Did she ever have to move out of the house?

A. [by the witness M.S.] Yes. I had—there was one occasion where I felt it was a suicide attempt and I called the Crisis Center and I took her down to the Crisis Center and they admitted her to—about the third time I took her to the Crisis Center they admitted her to the State Hospital.

Q. And where else did she live during this period of time?

A. She also spent a month at Colonial Hills, which was a private hospital, and then after that she came home for just a couple of days and then went into Buckner Baptist Home and I believe she lived there about 18 months.

Q. [by the State] After you moved to Minnesota, did you continue to have problems with [E.S.]?

A. [by the witness M.S.] Yes, I did.

Q. What sort of problems?

A. Second week that she went into school and she took some pills before she had to go to school and I got her there and she was hysterical and—a lot of problems in school. She would miss school. I had one outburst where she physically attacked [her sister] and bruised her pretty badly and it was after that that I really got serious help and she got back in counseling. She was in counseling at school, but after this outburst I got her into Hennison County Children's Mental Health.

Q. And when was that?

A. That was in May of '92, I believe.

Q. And since May of 1992 has she been in counseling?

A. Yes, she has.

Q. When she first started in May of 1992, when she started counseling, how often was she going to counseling?

A. For a while she was going every week and then it went every other week. But it was basically every other week.

Q. When she went every other week did she improve to some extent?

A. Little bit, yes.

A. She got upset when she found out we were coming back to San Antonio to go back through this [retrial].

Q. Since July of the summer when I called you has she had to have more intensive counseling?

*Hilliard v. State,* 881 S.W.2d 917, 921 (Tex. App.—Fort Worth 1994, no pet.). "The determination of whether the evidence elicited by the questions on cross-examination is admissible is a determination of the relevancy of the evidence." *Id.* A trial court's ruling on the admissibility of evidence is subject to

A. Yes, she has been going every week.

Q. And has that seemed to help to some extent?

A. Yes, it has.

Q. Doesn't get in trouble at school?

A. No.

Q. You, don't get called to school for discipline problems?

A. No. On all her progress reports it is what a great kid she is to have in the class.

Q. That has been an improvement?

A. Yes.

Q. Did she—prior to me calling you to come back down did she have any problems with her appetite or sleep disturbance or depression or did that improve?

A. She was having a little problem with that.

Q. After calling in July of this year to come back down and informing you that you would be coming back down, was there a change in that?

A. She still had some sleep disturbance, She had nightmares about it. It bothered her. But she didn't go on medication for it. She just—the counseling that she was having, the counselor she had really helped her work through it.

Q. [by the State] What about—have you had counseling or problems because of what happened?

A. I have had some counseling. I went to a mothers' group when all of this came about two, three, four years ago when it first started. I went to a mother's group and had counseling that way. As far as a private counselor, no.

Q. Has this been something that—has this been a problem for you and your family to work through, you and [C.S. and E.S.] over the last several years?

A. Yes.

Q. And has it once again become a problem very recently?

A. Yes, it did.

Q. So this is still something you are having to go through and [E.S.] is having to go through even up until this day?

A. Yes. It was something we were hoping was behind us but it's come up again and it has created some problems.

MS. BORDINI: I have no further questions, Your Honor.

an abuse of discretion standard on appeal. *Duckett v. State,* 797 S.W.2d 906, 910 (Tex. Crim.App.1990). An abuse of discretion will be found only "when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). Even if the trial court's reason for its ruling is incorrect, the ruling will be upheld if it is permissible under any theory applicable to the case. *See Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990).

### *Texas Rule of Criminal Evidence 412*

Draheim's counsel informed the trial court that he sought to cross-examine M.S. regarding previous sexual abuse pursuant to Rule 412 of the Texas Rules of Evidence, which is commonly referred to as the Texas rape shield law. The State objected, arguing that M.S.'s testimony would be based on hearsay and not personal knowledge. The trial court permitted a bill. During the bill, M.S. testified that E.S., as well as another daughter and a caseworker, had told her that E.S. had suffered prior sexual abuse by her father and brother. Contrary to the suggestion of Draheim's counsel, however, the trial court did not sustain the State's objection under Rule 412; rather, the trial court sustained the State's objection because the proferred testimony rested upon hearsay and was irrelevant since M.S.'s testimony had been restricted to E.S.'s problems and counseling after Draheim's assault. Since the basis upon which Draheim sought to cross-examine M.S. was Rule 412, however, the careful trial judge also noted, "[f]or the record," that he did not believe the testimony came within any exception to Rule 412.

On appeal, Draheim does not argue that the proferred testimony was not excludable hearsay, since the majority of it clearly was hearsay under Texas Rules of Criminal Evidence 801–805. Rather, Draheim argues that the testimony was admissible under the exceptions stated in subsections (b)(2)(A) and (b)(2)(B) of Texas Rule of Criminal Evidence 412. We disagree.

■ Rule 412, like its statutory predecessors, derives from efforts by the courts and the legislature to restrict the introduction of evidence regarding the complainant's prior *consensual* sexual behavior to situations in which the evidence is both relevant to a defendant's defense and not unduly prejudicial or inflammatory. *See Allen v. State,* 700 S.W.2d 924, 929–30 (Tex.Crim.App.1985) (discussing history of statutory predecessor of Rule 412); *see id.* at 932 ("a statute that purports to prohibit completely the introduction of the victim's *consensual* sexual activity with persons other than the defendant is unconstitutional unless given a judicial gloss [requiring certain procedures and providing certain exceptions]") (emphasis added).

■ In this case, Draheim did not seek to introduce evidence regarding E.S.'s past consensual sexual behavior. Rather, he sought to introduce testimony regarding the past sexual behavior of third-parties—sexual behavior that could not have been consented to by E.S. Under these circumstances, we do not believe Rule 412 applies. Accordingly, the admissibility of the proferred testimony must be evaluated under general evidence principles. As noted above, the majority of M.S.'s proferred but excluded testimony was based upon hearsay and, to this extent, the trial judge's ruling was plainly correct. In this regard, we note that Draheim's counsel did not seek to elicit non-hearsay testimony regarding the prior sexual abuse from E.S.; indeed, Draheim's counsel conducted no cross-examination of E.S. The trial judge was also correct in excluding the testimony that was not hearsay as irrelevant under the general principles governing the admission of mitigating evidence at the punishment phase, as discussed below.

### *Mitigating Evidence*

"Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is

being tried...." TEX.CODE CRIM.PROC. art. 37.07, § 3(a) (Vernon Supp.1995).

■ The focus of the punishment phase is thus the personal responsibility and moral blameworthiness of the defendant for the crime of which he has been convicted. Accordingly, "victim impact" evidence is admissible at the punishment phase if the evidence has some tendency to demonstrate the defendant's " 'personal responsibility and moral guilt.' " *Stavinoha v. State,* 808 S.W.2d 76, 79 (Tex.Crim.App.1991) (quoting *Miller–El v. State,* 782 S.W.2d 892, 896 (Tex.Crim.App. 1990)). Conversely, evidence regarding the offense or the defendant, which tends to reduce a defendant's moral blameworthiness, may be received as mitigating evidence. *Stiehl v. State,* 585 S.W.2d 716, 718 (Tex. Crim.App.1979), *cert. denied,* 449 U.S. 1114, 101 S.Ct. 926, 66 L.Ed.2d 843 (1981); *cf.* TEX.CODE CRIM.PROC. art. 37.071 (Vernon Supp.1995) (in capital cases, jury to be instructed that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness"). The admissibility of evidence at a punishment trial is thus "a function of policy rather than relevancy." *Miller–El,* 782 S.W.2d at 895.

■ Evidence that E.S. had been sexually abused by persons other than Draheim is not evidence regarding either the circumstances of the offense or Draheim himself, nor is it evidence a juror might regard as reducing Draheim's moral blameworthiness. Indeed, to admit evidence that E.S. had been sexually abused by persons other than Draheim would, we believe, perniciously suggest to a lay juror both that Draheim's conduct, standing alone, could not have caused the psychological and behavioral problems exhibited by E.S. after his assault and that, as a result, Draheim was somehow less blameworthy. Moreover, we have closely reviewed the record in this case and agree with the trial judge that M.S.'s testimony was restricted to E.S.'s problems and counseling after Draheim's assault. We hold, therefore, the trial judge acted within the ambit of his considerable discretion in excluding the proferred testimony.

*Harm*

Even if the trial court's exclusion of the proferred testimony was error, we hold that it was not harmful error under the test set forth in *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). *See Shelby v. State,* 819 S.W.2d 544, 547 (Tex.Crim.App.1991).

■ If "the damaging potential of the cross-examination were fully realized," the jury would have been informed that E.S. had been sexually abused by her brother since she was two and later by her father and that this repeated abuse had resulted in symptoms identical to those exhibited by E.S. following Draheim's assault. However, while this testimony would not have been cumulative of other testimony, the jury was indirectly informed of the prior sexual abuse in the closing arguments of both Draheim's counsel and the State:

> Draheim's Counsel: That poor child knew why she was there. She knew why she was brought there. She knew what to do when she was there. Did that look like somebody that had never done that before? Did that look like somebody who had no idea what they were doing? She made him breakfast the next morning. Her father watched that videotape; he took her home. Her father knew what happened. He took her home and she lived with him for four more months. The trauma that child suffered at the hands of my client, no doubt but, you know—*you know that was not the first time.* She knew what was happening. *You know that wasn't the first one and he didn't seduce her* ....

> State's Counsel: And whether or not she was victimized before or not, does it make [it] any better that he picks on somebody who's already been victimized? That makes her an easy target?

Moreover, we do not believe that M.S.'s testimony regarding E.S.'s behavioral and emotional problems was particularly important to the State's punishment case against Draheim; even without this testimony, the jury could and would have inferred that Draheim's assault on this young girl would cause her serious psychological and behavioral problems. Even more importantly, the overall strength of the prosecution's case was made by Draheim, the videotape he made of his offense, and his apparent lack of remorse. *See Shelby*, 819 S.W.2d at 547 (citing *Van Arsdall*, 475 U.S. at 684–85, 106 S.Ct. at 1438).

Having weighed the first two prongs of the *Van Arsdall* test, we conclude that the error, if any, in excluding the proferred testimony was harmless beyond a reasonable doubt. Draheim's first point of error is therefore overruled.

### ADMISSION OF DRAHEIM'S VIDEOTAPE OF HIS OFFENSE

In his second point of error, Draheim argues that the trial court erred in admitting the videotape he made of his offense over his objection that the prejudicial effect of the videotape outweighed its probative value. *See* TEX.R.CRIM.EVID. 403. We disagree.

■■■ "Like still photographs, motion pictures may be admitted into evidence where they are properly authenticated, relevant to the issues and not violative of the rules established for the admissibility of photographs." *Gordon v. State*, 784 S.W.2d 410, 412 (Tex.Crim.App.1990). As a general rule, "photos are admissible when verbal testimony as to the matters depicted in the photos is also admissible." *Hicks v. State*, 860 S.W.2d 419, 426 (Tex.Crim.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2725, 129 L.Ed.2d 848 (1994). In these circumstances, photographs or videotapes are inadmissible only if their probative value is "*substantially* outweighed by the danger of *unfair* prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or *needless* presentation of cumulative evidence." TEX.R.CRIM.EVID. 403 (emphasis added). The trial court's decision to admit a videotape is subject to an abuse of discretion

standard on appeal. *Gordon*, 784 S.W.2d at 411 (quoting *Marras v. State*, 741 S.W.2d 395, 404 (Tex.Crim.App.1987)).

■■■ As noted above, the focus at a punishment trial is the personal responsibility and moral blameworthiness of the defendant. Clearly, the fact that Draheim videotaped his sexual assault of this child is relevant to both issues, as even Draheim recognizes. He argues, however, that the contents of the videotape should have been excluded because his guilt was not in issue once he pleaded guilty; the tape was extremely lengthy, in color, and extremely detailed and, therefore, "highly inflammatory"; and the tape was cumulative of E.S.'s testimony. We disagree.

Pleading guilty established Draheim's legal guilt for the offenses charged but it did not establish the extent of his personal responsibility or his moral blameworthiness for the crimes against E.S.—the sole issue before the jury in the sentencing trial. And the fact that the tape was "highly inflammatory" says no more than that Draheim's crimes were "highly inflammatory"; it does not establish that the tape was unfairly prejudicial. *See Moreno v. State*, 858 S.W.2d 453, 462–63 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993).

In short, while Draheim's videotape was unquestionably prejudicial, it was not *unfairly* prejudicial. And, while the tape was cumulative of E.S.'s testimony in the sense that it depicted the same events, it was not *needlessly* cumulative of any evidence of the extent of Draheim's moral blameworthiness. Accordingly, the trial court acted within the ambit of its discretion in admitting the videotape, and Draheim's second point of error is overruled.

### PROSECUTORIAL REFERENCES TO HARDSHIPS IMPOSED BY DRAHEIM'S EXERCISE OF HIS RIGHT TO TRIAL BY JURY

In his third point of error, Draheim argues that the prosecutor's questions to E.S.'s mother regarding, and references during closing arguments to, the hardships suffered by E.S., her mother, the prosecutor, and the jury constituted fundamental error because they improperly suggested that the jury im-

pose a higher sentence on Draheim because he exercised his right to a trial by jury.[4] We disagree.

As indicated by Draheim's phrasing of his point of error as involving "fundamental" error, Draheim's counsel did not object either to the prosecutor's questions or to her closing arguments. As a general rule, the failure to timely object waives the asserted error. *See, e.g., Dinkins v. State,* 894 S.W.2d 330, 335 (Tex.Crim.App.), *cert. denied,* ── U.S. ──, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); *Miller v. State,* 741 S.W.2d 382, 391–92 (Tex.Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 935 (1988); TEX.R.APP.P. 52(a). Fundamental error occurs only when the asserted error raises a serious question of "[f]undamental unfairness and considerations of due process...." *Boutwell v. State,* 719 S.W.2d 164, 173 (Tex.Crim.App.1985), *rev'd on other grounds,* 841 S.W.2d 407, 410–11 (Tex.Crim.App.1992). Even if fundamental error occurs, however, it will not result in reversal unless "the error is so egregious and created such harm that [the defendant] 'has not had a fair and impartial trial....'" *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984).

We have carefully reviewed the record in this case and find neither fundamental error nor egregious harm. As explained above, the prosecutors' questions to M.S. regarding the impact of the assault on E.S. were proper victim impact evidence. And the prosecutor's closing rebuttal argument regarding the difficulties involved in trying this case were not directed at Draheim's exercise of his right to trial by jury; rather, they recognized the painful nature of this case for all involved and, most importantly, sought to meet Draheim's counsel's closing argument, which impugned the State's intro-

duction of the videotape as unnecessary, and which attempted to reduce Draheim's moral accountability because E.S. had been abused previously and because he had already served prison time. Indeed, the record establishes that the facts regarding Draheim's previous trial and sentence, as well as his release following his successful habeas corpus proceeding, were repeatedly raised by Draheim's counsel, undoubtedly as a part of his effort to induce the jury to grant probation, in his individual voir dire (questions regarding "first trial," "punishment," "sentence," "outcome," and "first go-round"), his opening statements (when Draheim first pleaded guilty in 1989 or 1990, he "accepted responsibility" and was sentenced to prison), and his questioning of Ms. Babbitt (questions regarding Draheim's first trial and the habeas corpus proceeding) and Dr. Steeg (questions regarding Draheim's three-year imprisonment).

Draheim received a fair trial. Accordingly, his third point of error is overruled, and the judgment is affirmed.

---

4. In addition to the testimony set forth above in footnote 3, Draheim specifically complains of the following excerpt from the prosecutor's closing rebuttal argument:

> Most of the time, I like my job, I really do. Most of the time I come, I have a good day, but Wednesday was not one of those days. I sat there and I felt bad for having to show the [videotape] to you, and I was thinking to myself, how can I be doing it to them, but it

wasn't me that did it; it was him that did it. There's no reason I should be embarrassed. There's no reason she should be embarrassed. There is no reason that you-all should be embarrassed or feel bad, because it isn't any of us; it is him.... They talk about how he's able to accept responsibility but, you know what, he's not ever able to accept the consequences of his act and that's just as much a part of accepting responsibility.