IN THE COURT OF
CRIMINAL APPEALS

                                   OF
TEXAS

 

                                                                              

                                                               NO.
PD-1309-05



 

 

                                                    VINCENT DAVIS, Appellant

 

                                                                             v.

 

                                                        THE
STATE OF TEXAS

 



                   ON APPELLANT=S
PETITION FOR DISCRETIONARY REVIEW

                                       FROM
THE THIRD COURT OF APPEALS

                                                             TRAVIS  COUNTY



 

Cochran, J.,
delivered the opinion of the Court in which Keller, P.J., and Meyers,
Keasler, Hervey, and Holcomb,
JJ., joined.  Womack, J.,
filed a dissenting opinion in which Price
and Johnson, JJ., joined.

 

                                                                  O
P I N I O N 

 








A jury convicted appellant of
aggravated assault with a deadly weapon for attacking and trying to strangle
his live-in girlfriend, Patricia Ford.  On appeal, appellant claimed that the
trial court erred, under Crawford v. Washington,[1]
in admitting the hearsay statements that Ms. Ford made to a police officer at
the scene of the crime.  The Austin Court of Appeals concluded that, if Ms.
Ford=s hearsay statements were testimonial
in nature, the resulting Crawford error did not, under the factors set
out in Delaware v. Van Arsdall,[2] contribute to
his conviction or punishment.[3] We granted
appellant=s petition for review, which asks this Court to clarify the circumstances
in which federal constitutional error can be deemed harmless beyond a
reasonable doubt.[4]

I.








On January 6, 2003, appellant=s neighbor, Paula Weightman, went
outside to smoke a cigarette and heard Abloodcurdling screams coming from the
house across the street.@  She heard appellant=s girlfriend, Patricia Ford, scream, AGet out, get out.@  Then she heard appellant yell, AI will show you,@ accompanied by hitting noises and AOw.@   She called 911.  After Austin
police officers had responded to her call, she saw Ms. Ford come out of the
house, and though she Acouldn=t really stand up, . . . she was trying to run.@  Ms. Weightman called Ms. Ford over
and helped her onto Ms. Weightman=s porch.  Ms. Ford was trembling and
holding her neck.  She told Ms. Weightman, AHe tried to kill me.@  Ms. Ford seemed to be in shock and
couldn=t even get up the porch steps without
help.  She had bruises and abrasions that ran along the bottom of her neck as
if she were Awearing a necklace.@       APD Officers Cortez and Canizales had responded to Ms.
Weightman=s 911 call.  They heard appellant yelling and Ms. Ford screaming for
help.  Officer Cortez testified that he opened the door and told her to run out
of the house.  As Ms. Ford came out, she was screaming hysterically and
grabbing at her face with her hands.  He asked her if there were any weapons in
the house, and she said there weren=t.   He then ordered appellant out of
the house and handcuffed him.  Officer Cortez stayed with appellant while
Officer Canizales went across the street to Ms. Weightman=s front porch to get Ms. Ford=s side of the story.








Ms. Ford did not testify at trial.
Over hearsay and confrontation objections,[5]
Officer Canizales testified that Ms. Ford, still quite upset, told him the
following:  A[T]hat morning she told Mr. Davis that he was going to have to go out and
get a job or look for a job, and that started an argument between the two of
them.  During the argument he accused her of sleeping with somebody else.@  Although Ashe tried to get away from him, avoid
him by walking to different rooms,@ he continued to follow her.  When she
tried to exit the house Ashe was grabbed by her shirt and pulled back into the
residence and thrown on the couch.@  Appellant then Abegan to beat her about the face,
about the head with his fists.@  He Aput his thumbs into her eyes, and also pressed his fingers
into the temples of her head.@  Appellant then Aput his knee into her throat while
she was still laying on the couch@ and Atold her that he was going to teach
her about talking that way to him@ and Athreatened or told her that he was
going to beat her.@

Officer Canizales continued: 
According to Ms. Ford, appellant again accused her of seeing another man, so
she took a cup of coffee and Atried to throw the coffee on Mr. Davis to get away from him,
and he took the cup away from her.@  Appellant then Apicked her up and threw her on the
ground.@  She fell on her stomach and
appellant put his knee in her back, then he took a rope, wrapped it around her
neck, and pulled.  AWith his knee in her back, he pulled her by the rope around
the neck and pulled her torso off the floor.@  Ms. Ford Apleaded with him and told him that
she couldn=t breathe,@ so appellant  released her, ordered her to get her inhaler,
and he Apicked up the same rope that was
around her neck and began to unravel it.@  Ms. Ford again screamed, but
appellant Achoked her with his hands to keep her from screaming.  She pleaded with
him and promised not to scream.@ Finally, appellant Areleased her, and at that point she
tried to run out of the front door and was pulled back in.@  Then the officers arrived.           








Like Ms. Weightman, Officer Canizales
noticed Ms. Ford=s fresh injuries: there was blood on her lip and swelling on
her head and neck.  Those injuries were Aconsistent with what she told [him]
had occurred.@  The State offered photographs of Ms. Ford which showed Aredness around the neck.@  Pictures of the living room floor
showed the rope that she said appellant used to strangle her.  The rope itself
was admitted as an exhibit.  Two APD Victim Services workers also described Ms.
Ford=s injuries.  In addition, the State
offered into evidence Ms. Ford=s medical records that described the injuries to her face and
neck.

Appellant testified on his own
behalf.  He said that he and Ms. Ford got into an argument that escalated into
a shouting match.  He admitted hitting Ms. Ford, slapping the coffee out of her
hand, and then slapping her in the face.  He testified that he pushed her down
on the couch and held his finger to her temple Aand then something just said let her
go and I just stopped.@  He denied grabbing her face and pushing his thumbs into her
eyes, putting anything around her neck, or grabbing the rope.  When asked about
the presence of the rope on the living room floor, appellant said that he uses
it to tie his lawn mowing tools (rakes, brooms, weed-eater and cords) together
to put in the grocery basket that he uses to transport things.

In closing, defense counsel focused
on the fact that the jurors had heard from his client, who had admitted simple
assault, but that they had not heard from Ms. Ford.  He noted the irony of the
State wanting the jury Ato believe beyond a reasonable doubt what Patricia Ford said
when she wasn=t here.@  The State, on the other hand, reminded the jurors that they had heard
from Patricia Ford Athrough her statements to the officers.@








The jury was instructed on both
aggravated assault with a deadly weapon (appellant=s hands or a rope) and simple
assault.  It convicted appellant of the greater offense.  On appeal, appellant
claimed that the trial court committed harmful error under Crawford when
it admitted Ms. Ford=s out‑of‑court statements.  After setting out the
emerging law under Crawford, the court of appeals concluded that it need
not decide whether Ms. Ford=s statements were testimonial.[6] 
Even if the statements were testimonial, any error in admitting them was
harmless:

If the complained‑of hearsay
was testimonial in nature, applying the Van Arsdall analyses, we
conclude beyond a reasonable doubt that the error did not contribute to the
conviction or punishment assessed. There is no reasonable likelihood that the
error, if any, materially affected the jury=s deliberations.[7]








The State acknowledges that, under Wall
v. State,[8] Ms. Ford=s out-of-court statements to Officer
CanizalesBwhich were made in circumstances objectively indicating that the
emergency was over and the investigation had begunBwere testimonial and thus erroneously
admitted under Crawford.[9]  We turn then
to the remaining question of when federal constitutional error can be deemed
harmless beyond a reasonable doubt.

II.








In Chapman v. California,[10]
the Supreme Court held that Abefore a federal constitutional error can be held harmless,
the court must be able to declare a belief that it was harmless beyond a
reasonable doubt.@[11]  The Court said that although Athere are some constitutional rights
so basic to a fair trial that their infraction can never be treated as harmless
error@ not all Atrial errors which violate the
Constitution automatically call for reversal.@[12]  The Constitution gives the
defendant the right to a fair trial, not a perfect one.[13] 
Thus, the harmless-error doctrine Arecognizes the principle that the
central purpose of a criminal trial is to decide the factual question of the
defendant=s guilt or innocence, and promotes public respect for the criminal
process by focusing on the underlying fairness of the trial rather than on the
virtually inevitable presence of immaterial error.@[14]

The Supreme Court applied Chapman
to a Confrontation Clause error of admitting evidence in Harrington v.
California.[15]  In that
case, the trial court had admitted the confessions of two non-testifying
co-defendants in violation of the defendant=s Confrontation Clause rights. The
Supreme Court held that this violation was subject to a Chapman analysis,
and, because the evidence against the defendant was Aso overwhelming@ and the improperly admitted evidence
cumulative of the defendant=s own inculpatory statement, the error was harmless.[16]








The Supreme Court later applied Chapman
to a Confrontation Clause error excluding evidence in Delaware v. Van
Arsdall.[17]  In Van
Arsdall, the trial court improperly prevented  defense counsel in a murder
case from cross‑examining a prosecution witness to show his bias.  The
proposed cross-examination concerned an agreement that the witness had made to
tell the prosecutor about the murder in exchange for dismissing his unrelated
criminal charge of drunkenness.[18]  The Supreme
Court held that the defendant=s constitutional right to confront and cross-examine the
witness for bias was violated, but, like other Sixth Amendment errors, this
error in excluding evidence was subject to a harmless‑error analysis:

the constitutionally improper denial of a defendant=s opportunity to impeach a witness for bias, like other
Confrontation Clause errors, is subject to Chapman harmless‑error
analysis. The correct inquiry is whether, assuming that the damaging potential
of the cross‑examination were fully realized, a reviewing court might
nonetheless say that the error was harmless beyond a reasonable doubt. Whether
such an error is harmless in a particular case depends upon a host of factors,
all readily accessible to reviewing courts. [19]

 

Thus, when a trial court
unconstitutionally restricts cross-examination, the reviewing court  first
assumes that Athe damaging potential of the cross-examination@ had occurred (e.g., the
prosecution witness in Van Arsdall had been fully impeached with his
agreement with the State).  The reviewing court then asks:  Would the admission
of that impeachment evidence, in the context of the trial as a whole, likely
have made any significant impact upon the minds of an average jury?[20] 
To decide that question, the Court set out a number of non-exclusive factors,
including: 

(1)       The importance of the witness=s testimony in the prosecution=s case; 

(2)       Whether the testimony was
cumulative; 

(3)       The presence or absence of
evidence corroborating or contradicting the witness=s testimony on material points;

(4)       The extent of cross-examination
otherwise permitted; and 








(5)       The overall strength of the
prosecution=s case.[21]

 

Most of these factors apply
regardless of whether the constitutional error was in the admission or
exclusion of evidence.  But the initial Aassumption@ that the damaging potential of the
cross-examination had been realized applies only when the trial court restricts
cross-examination or excludes evidence.  In those instances, the reviewing
court must determine whether it is convinced, beyond a reasonable doubt, that
the fact-finding process was reliable even if the improperly restricted or
excluded evidence is factored into the analysis.  But when the error involves
the admission of evidence in violation of the Confrontation Clause,
reviewing courts may not speculate as to whether cross-examination would have
been effective or not, had it occurred.[22]








In Shelby v. State,[23]
we adopted the Van Arsdall analysis for assessing harm when the trial
court improperly limited the scope of cross‑examination of the
complainant=s mother about a lawsuit she filed against the defendant and others after
she had reported an aggravated sexual assault to the police.[24]  
Since then, this Court has applied the Van Arsdall analysis to errors of
excluding evidence or restricting cross-examination.[25] 
Texas courts of appeals have likewise applied Van Arsdall and Shelby to
errors of exclusion.[26]  








Some Texas courts have also applied Van
Arsdall or Shelby, with the assumption that the purposes of
cross-examination were fully met, to improperly admitted evidence.[27] 
 But when a witness does not testify at trial, it is difficult, if not
impossible, to gauge how cross-examination might have impeached his in-court
testimony, what bias he might have admitted to, what inconsistent statements he
might have made during his testimony, how his demeanor might have affected the
jury, and so forth.  As the Supreme Court has stated, Asuch an inquiry would obviously
involve pure speculation, and harmlessness must therefore be determined on the
basis of the remaining evidence,@ while putting aside the out-of-court
declarant=s testimony.[28]

We therefore take this opportunity to
clarify that the Van Arsdall initial assumption (Athat the damaging potential of the
cross‑examination were fully realized@) applies to confrontation errors of
exclusion, not confrontation errors of admission.  On the other hand, most of
the non-exclusive list of factors set out in Van Arsdall may well be
applicable in analyzing whether constitutional error in the admission of
evidence is harmless under a Chapman analysis. 

Thus, courts reviewing whether the
error in admitting out-of-court statements in violation of Crawford is
harmless beyond a reasonable doubt should consider:

(1)       The importance of the hearsay
statements to the State=s case;

(2)       Whether the hearsay evidence
was cumulative of other evidence;

(3)       The presence or absence of
evidence corroborating or contradicting the hearsay testimony on material
points; and 








(4)       The overall strength of the
prosecution=s case.[29]

 

Of course courts may consider other
factors as well, but, in the final analysis, the reviewing court must be
convinced, beyond a reasonable doubt, that the admission of Crawford-barred
testimony would probably not have had a significant impact on the mind of an
average juror.[30]  Put another
way, is there a reasonable possibility that the Crawford error, within
the context of the entire trial, Amoved the jury from a state of
non-persuasion to one of persuasion@ on a particular issue?[31] 
With those general legal principles in mind, we turn to the question of whether
the erroneous admission of Ms. Ford=s out-of-court testimonial statements
to Officer Canizales was harmless beyond a reasonable doubt.

III.








In this case, the court of appeals
applied a modified Van Arsdall analysis.  The court cited the entire Van
Arsdall test, but it did not apply the double assumption that 1) Ms. Ford
testified, and 2) appellant was able to fully cross-examine her to show any
bias.[32]  In a
footnote, the court correctly noted that, AThe Van Arsdall factors in the
second prong of the analyses were developed in light of the particular facts there
presented . . . . Like factors in other contexts, the Van Arsdall factors
do not always present a >one shoe fits all= analysis easily applied to every
case.@[33] Applying what it found to be the
applicable factors, the court stated,

In applying the Van Arsdall
factors to the facts of the instant case, we find that the hearsay testimony
involved was vital to the State=s case. Without it, the State could not have established the
elements of the offense. However, appellant made a judicial confession
corroborating much of the declarant=s statements to Officer Canizales.
Appellant confirmed the background evidence of his relationship with Ford, the
declarant. He admitted that he started the shouting match and assaulted the
declarant and acknowledged that he inflicted the injuries shown in a photograph
of the declarant. While appellant=s version of the assault did not
exactly match that of the declarant as revealed by Officer Manizales=s testimony, the evidence clearly
supported the general verdict of the jury.[34]








In large part, we agree with the
court of appeals. We disagree, however, with that court=s statement that the State could not
have established the elements of aggravated assault without Ms. Ford=s testimonial hearsay.  Appellant
argues that Ms. Ford=s testimonial statements were Avital to the State=s case,@ and claims that A[t]he only evidence offered by
the State to prove the deadly weapon element was Officer Canizales=s testimony about hearsay statements
by Ms. Ford.  Without that testimony, >the State could not have established
the elements of the offense.=@[35]  It is true, as appellant asserts,
that he Anever admitted the use of a deadly
weapon, as alleged in the indictment.  To the contrary, he explicitly denied
choking Ms. Ford, pressing his thumbs into her eyes or placing a rope around
her neck.@[36]  

But appellant overstates things when
he says that the only evidence to support the deadly weapon finding was Ms.
Ford=s testimonial statements to Officer
Canizales.  As the State recognizes, Aother evidence at trial showed that
[appellant] attempted to strangle the victim with a ligature.@[37]  That evidence included the
following:  

$                  
Paula Weightman testified that,
when Ms. Ford came running out of her house, she was Aholding her neck@
and said AHe tried to kill me.@[38]  Ms. Weightman said that Ms. Ford=s voice was Ahoarse.@  Ms. Weightman remembered Aseeing bruises . . . seeing the mark around her neck.@  AIt looked
between an abrasion and a hematoma.@ 
She indicated the linear injury to the jury by drawing a line with her finger
around the base of the neck. She noted that on the day after the assault (as
well as a week after the assault),  Ms. Ford Awas bruised and swollen.@ 
The injuries were Amore visible@ as
they had Agotten darker.@ 

 

$                                                                                                                                          
Officer Canizales observed Aa big knot on the side of [Ms. Ford=s] face, there was blood on her lip, and there was
redness on her neck.@  He testified that the injuries appeared to be
consistent with injuries caused by a rope like that found at the scene being
pulled against her neck.         








 

$                  
Photographs of Ms. Ford  showed Aredness around the neck@; another photo showed a rope on the floor in the living room.[39]

 

$                  
The rope itself was admitted as an
exhibit.

 

$                  
An APD Victim Services crisis
intervention responder testified about Ms. Ford=s injuries.  He noticed Aswelling
on her check@ as well as Ascratches
on her face and on her neck.@  He agreed
that the injuries were Aconsistent with strangulation by a rope.@

 

$                  
A second APD Victim Services
worker who visited Ms.  Ford the day after the assault testified that she had Aan obvious black eye or bruising to her face.  She
also had very, very dark bruising around her neck.@  

 

$                  
An APD homicide detective
testified as a strangulation expert and said that Avictims of a choking will have difficulty speaking,
will be hoarse.  Voices will be strained.  Sometimes they will cough.@  He stated that ALigature
injuries to the neck tend to be very linear.@ 
He also testified that the rope admitted as an exhibit could have been used as
a deadly weapon.

 

$                  
Medical records were admitted that
described injuries to the right side of Ms. Ford=s face and neck, as well as the assault itself.  The unobjected-to EMS
records contain an entry that state that the patient was assaulted with Ahand blows to the face and a rope was tied around her neck.@  The unobjected-to hospital records contain notes
indicating that Ms. Ford=s live-in boyfriend tried Ato strangle her with a cord,@ was Abeating her up,@ and Aproceeded to
beat her and attempt to choke her.@[40]

 

$                  
Appellant testified and agreed
that Ms. Ford did not have any bruises before their fight.  And though he
denied strangling Ms. Ford with his hands or a rope, he stated that the
injuries in the photos of Ms. Ford reflect the injuries that he inflicted on
her.

 








Although Ms. Ford=s testimonial statements concerning
how appellant had attempted to strangle her with a rope were assuredly Aimportant@ to the State=s case, they were also cumulative of
significant other evidence which proved that same fact.  There was ample other
evidence that corroborated her hearsay statements, and the only evidence
contradicting the allegation that appellant attempted to strangle her was his
flat denial.  He had, however, no other explanation for the rope-mark bruises
around the base of her neck and he admitted that he had caused her injuries. 
Where could the neck injuries have come from if not from the rope left lying on
the living room floor?  These injuries speak for themselves.  Taken as a whole,
the non-testimonial, admissible evidence showing that appellant used a rope as
a deadly weapon in attempting to strangle Ms. Ford is overwhelming. 








One could argue that appellant might
never have testified had Ms. Ford=s testimonial statements not been
improperly introduced.  First, this is not an argument appellant has ever made,
either in the trial court or on appeal. Although appellant could have told the
trial court that he was calling his client to testify solely to rebut and
explain the inadmissible hearsay offered by the State,[41]
he did not do so.  Second, this argument requires the reviewing court to
speculate as to how the parties= trial strategy and tactics might have been different had the
trial court made different evidentiary rulings than the ones it did make.  Just
as we may not speculate as to the possible efficacy of cross-examination had it
occurred, we cannot speculate as to whether appellant would have testified had
the trial court disallowed Officer Canizales=s testimony concerning Ms. Ford=s statements.[42]  
Third, without appellant=s testimony, nothing in the record would support his position
that he did not use a deadly weapon when he assaulted Ms. Ford.  That is, the
only evidence relative to the use of a deadly weapon would be that which tended
to prove that appellant used a rope to strangle Ms. Ford.  








Appellant does claim that the State
made Aartful use of the wrongly admitted
testimony@ by arguing to the jury that Ms. Ford was more credible because her
testimony was presented as an excited utterance:  AThe law presumes that you are
incapable of making something up because you are so traumatized by that event
that all you can do is blurt out what happened.  That=s why you have her statements to
Officer Canizales.@  That, of course, is not an entirely correct statement of
the law, but appellant did not object to it.  Furthermore, that same rationale
applies to the properly admitted excited statements to Ms. Ford=s neighbor and to the properly
admitted statements made for medical purposes to the EMS and hospital
personnel.  Appellant argues that the State simply did not want Ms. Ford to
testify because she could be cross-examined with the fact that she had a
criminal record and mental health problems.  Although she could be
cross-examined with such material, neither a criminal record nor mental health
problems would account for the rope-mark bruises on her neck, and it is solely
the Adeadly weapon@ element appellant disputes.  One
could vigorously and extensively cross-examine Ms. Ford, but the rope-mark
bruises would still be on her neck, and there is no alternate explanation for
them, not even a hypothetical one.

In sum, we agree with the conclusion
of the court of appeals that the Crawford error in this case was
harmless beyond a reasonable doubt.   We affirm its judgment.

Delivered:  October 11, 2006

Publish









[1]
541 U.S. 36 (2004).





[2]
475 U.S. 673 (1986).





[3]
Davis v. State, 169 S.W.3d 660, 673 (Tex. App.CAustin 2005).





[4]
We granted both of appellant=s
grounds for review:

1.         Review
should be granted to resolve a conflict among the courts of appeals as to what
constitutes Atestimonial@ evidence within the
meaning of Crawford v. Washington.

2.         Review
should be granted to clarify the circumstances in which federal constitutional
error can be deemed harmless beyond a reasonable doubt.

However, as
noted infra, the State now concedes that the statements at issue in this
case were testimonial, based on intervening case law.  Thus we need address
only the second issue.





[5]
While appellant=s
direct appeal was pending, the United States Supreme Court delivered its
decision in Crawford v. Washington, 541 U.S. 36 (2004).  The trial court
therefore did not have the benefit of Crawford when making the decision
of whether to admit Ms. Ford=s
hearsay statements.  The trial court held a hearing outside the jury to preview
both officers=
testimony, and, after considering the parties=
arguments, ruled that Ms. Ford=s
Astatement meets that
reliability test that an excited utterance is designed to meet.@ 





[6] 
The court of appeals reasoned,

The oral statements made by Ford to the
uniformed Officer Canizales identified appellant and then, in a series of
accusations against appellant, detailed blow by blow the assault made upon her.
Surely, a reasonable 51‑year‑old declarant like Ford would have
known that her accusations made to a uniformed police officer would be passed
on to prosecutorial authorities to be used against appellant. Ford=s statements may serve
either or both of two primary objectivesBto
gain immediate official assistance in terminating an exigent situation and to
provide information to aid investigation and possible prosecution arising from
the situation. Merely because a declarant is excited, the statements made do
not lose their character as testimonial statements subject to the Confrontation
Clause.

In the instant case,
it is difficult to draw a definitive line between testimonial and
nontestimonial hearsay evidence developed in this pre‑Crawford
trial in order to reach the proper disposition of this appeal. We find that we
do not have to do so.

If, in the instant
case, the objected‑to hearsay was nontestimonial, then no Confrontation
Clause error is presented. If, on the other hand, the hearsay was testimonial,
then Crawford applies, and constitutional error occurred.

Davis, 169 S.W.3d at
672.





[7]
Id. at 673. 





[8]
184 S.W.3d 730 (Tex. Crim. App. 2006).





[9] State=s Reply Brief at 11.  See
also [Adrian Martell] Davis v. Washington, 126 S.Ct. 2266, 2273-74 (2006) (AWithout attempting to
produce an exhaustive classification of all conceivable statementsBor even all conceivable
statements in response to police interrogationBas
either testimonial or nontestimonial, it suffices to decide the present cases
to hold as follows: Statements are nontestimonial when made in the course of
police interrogation under circumstances objectively indicating that the
primary purpose of the interrogation is to enable police assistance to meet an
ongoing emergency. They are testimonial when the circumstances objectively
indicate that there is no such ongoing emergency, and that the primary purpose
of the interrogation is to establish or prove past events potentially relevant
to later criminal prosecution@).           





[10]
386 U.S. 18 (1967).





[11]
Id. at 24.





[12]
Id. at 23.





[13]
Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).





[14]
Id. (internal citation omitted).





[15]
395 U.S. 250 (1969).





[16]
Id. at 254.  The Supreme Court stated, AOur
judgment must be based on our own reading of the record and on what seems to us
to have been the probable impact of the two confessions on the minds of an average
jury.@  Id.





[17]
475 U.S. 673 (1986).





[18]
Id. at 676.





[19]
Id. at 684; see also Olden v. Kentucky, 488 U.S. 227, 232 (1988)
(applying Van Arsdall).





[20]
Harrington, 395 U.S. at 254; see Schneble v. Florida, 405 U.S.
427, 432 (1972) (concluding Athat
the >minds of an average
jury= would not have
found the State=s case
significantly less persuasive@
had the improperly admitted testimony been excluded).





[21]
Van Arsdall, 475 U.S. at 684.





[22]
See Coy v. Iowa, 487 U.S. 1012, 1022 (1988).  In Coy, the Supreme
Court considered an Iowa statute that allowed the placement of an opaque screen
between the defendant charged with sexual assault and his two teenage victims. 
The Court held that the defendant=s
right to face‑to‑face confrontation was violated since the screen
allowed the complaining witnesses to avoid viewing the defendant as they gave
their testimony.  Nevertheless, the court agreed that, like the other
Confrontation Clause violations, this one was subject to the Chapman
harmless‑error analysis, but it noted that A[a]n
assessment of harmlessness cannot include consideration of whether the witness= testimony would have been
unchanged, or the jury=s
assessment unaltered, had there been confrontation; such an inquiry would
obviously involve pure speculation, and harmlessness must therefore be
determined on the basis of the remaining evidence.@  Id. at 1021-22.





[23]
819 S.W.2d 544 (Tex. Crim. App. 1991).





[24]
Id. at 547. 





[25]
See, e.g., Love v. State, 861 S.W.2d 899, 907 (Tex. Crim. App. 1993)
(finding that Confrontation Clause error in restricting cross-examination was
harmful under Van Arsdall and Shelby; noting that the Aprecluded evidence cast
doubt on the reliability of the breath test result and discredited some
testimony@ by expert
in DWI trial); Young v. State, 891 S.W.2d 945, 948-49 (Tex. Crim. App.
1994) (stating that Van Arsdall, as adopted in Shelby, guides the
harmless error analysis for the improper exclusion of evidence under
evidentiary rules as well as constitutional rules).





[26]
See, e.g., Fox v. State, 115 S.W.3d 550, 569 (Tex. App.CHouston [14th
Dist.] 2002, pet. ref=d)
(finding harmful error under Van Arsdall when trial court prevented
cross-examination that would have shown outcry witness=s bias against defendant); Draheim v. State,
916 S.W.2d 593, 600-01 (Tex. App.CFort
Worth 1996, pet. ref=d)
(stating that A[i]f >the damaging potential
of the cross‑examination were fully realized,= the jury would have been informed that E.S.
had been sexually abused by her brother since she was two and later by her
father and that this repeated abuse had resulted in symptoms identical to those
exhibited by E.S. following Draheim=s
assault@; holding that
Athe trial judge acted
within the ambit of his considerable discretion in excluding the proffered
testimony,@ but that
even if he hadn=t, the
error was not harmful error under the test set forth in Van Arsdall).





[27]
For example, in Rodriguez v. State, 926 S.W.2d 379, 381 (Tex. App.CSan Antonio 1996, no pet.),
the court applied the Van Arsdall assumption to the error admitting a
statement given by a non-testifying eyewitness to the police in a pre‑trial
investigation.  And in Gutierrez v. State, 150 S.W.3d 827, 831 (Tex.
App.CHouston [14th
Dist.] 2004, no pet.), the Van Arsdall analysis and assumption
were applied to a Crawford error.  In Gutierrez, the court found
constitutional error in the admission of an informant=s hearsay statement in which he explained that
the defendant, a pharmacist technician for a hospital, would steal drugs from
the hospital and sell them to the informant, who then resold them.  In
assessing harm, the court applied Van Arsdall, and stated, AIn applying this test, we
focus on [the informant] Felan=s
statement and assume that the damaging potential of the cross‑examination
was fully realized. We assume that appellant would have been permitted to fully
cross‑examine Felan and, thus, had the opportunity to discredit Felan as
a witness. With that assumption in mind, we review the error in connection with
the following five factors . . . .@
Id.





[28]
Coy, 487 U.S. at 1022.





[29]
See Van Arsdall, 475 U.S. at 684.  The fourth Van Arsdall
factorBthe extent of
cross-examination otherwise permittedBis,
like the initial assumption, inapplicable in the context of Crawford-barred
hearsay statements which, by definition, were subject to no cross-examination.





[30]
See Harrington, 395 U.S. at 254; Schneble, 405 U.S. at 432; Yates
v. Evatt, 500 U.S. 391, 403 (1991) (ATo
say that an error did not contribute to the ensuing verdict is . . . to find
that error unimportant in relation to everything else the jury considered on
the issue in question, as revealed in the record@);
see also People v. Patterson, 841 N.E.2d 889, 906 (Ill. 2005) (applying Chapman
analysis to Crawford error and finding it harmless); People v.
Houston, 130 Cal App. 4th 279, 301 (2005) (even if admission of
murder victim=s
statements to medical personnel was Crawford error, it was harmless
under Chapman because there was overwhelming evidence of his guilt and
the statements were largely tangential and cumulative of other evidence); Davis
v. United States, 848 A.2d 596, 599-600 (D.C. 2004) (concluding that error
in admitting Crawford-barred testimony was not harmless beyond a
reasonable doubt under Chapman).





[31]
Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).





[32]
Davis, 169 S.W.3d at 672-73.





[33]
Id. at 673 n.8 (citing Hale v. State, 139 S.W.3d 418, 422 (Tex.
App.CFort Worth 2004,
pet. filed), and Scott v. State, 165 S.W.3d 27, 48 (Tex. App.CAustin 2005, pet.
granted)).





[34]
Id. at 673.





[35]
Appellant=s Brief at
17 (quoting Davis, 169 S.W.3d at 673).





[36]
Id. at 18.





[37]
State=s Reply Brief at
13. 





[38]
This statement was admitted as an excited utterance and appellant does not
suggest that it is testimonial under Crawford.  





[39]
The copies of the photographic exhibits are fuzzy, but Officer Canizales
described them for purposes of the record.





[40]
These records came into evidence with ANo
objection@ from the
defense.  As the State points out, the records contain information about Ms.
Ford=s mental-health
issues.  Though the State had wanted this information redacted, the court let
it in so that the jury could consider it Ain
determining credibility of a non-testifying witness.@





[41]
See, e.g., Leday v. State,
983 S.W.2d 713, 718-19 (Tex. Crim. App. 1998) (holding that defendant=s testimony which is Aimpelled by State=s introduction of evidence
that was obtained in violation of law@
does not constitute a waiver of his prior objection). 





[42]
In a similar, but reverse, situation, the Supreme Court has held that a
defendant who declines to testify cannot complain on appeal that the trial
court=s in limine
ruling permitting cross-examination with prior convictions under Fed. R. Evid.
609 was erroneous.  Luce v. United States, 469 U.S. 38, 41-42 (1984)
(concluding that any possible harm from the trial court=s ruling was speculative because the defendant
did not testify; rejecting the argument made on appeal that the defendant would
have testified had he been able to do so free from impeachment with prior
convictions and noting, ABecause
an accused=s decision
whether to testify >seldom
turns on the resolution of one factor,=
a reviewing court cannot assume that the adverse ruling motivated a defendant=s decision not to testify@) (internal citation
omitted).