Vincent DAVIS, Appellant,

v.

The STATE of Texas.

No. PD–1309–05.

Court of Criminal Appeals of Texas.

Oct. 11, 2006.

**846**

Charles A. Palmer, Austin, for Appellant.

Holly E. Taylor, Assistant District Atty., Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, KEASLER, HERVEY, and HOLCOMB, JJ., joined.

A jury convicted appellant of aggravated assault with a deadly weapon for attacking and trying to strangle his live-in girlfriend, Patricia Ford. On appeal, appellant claimed that the trial court erred, under *Crawford v. Washington,*[1] in admitting the hearsay statements that Ms. Ford made to a police officer at the scene of the crime. The Austin Court of Appeals concluded that, if Ms. Ford's hearsay statements were testimonial in nature, the resulting *Crawford* error did not, under the factors set out in *Delaware v. Van Arsdall,*[2] contribute to his conviction or punishment.[3] We granted appellant's petition for review, which asks this Court to clarify the circumstances in which federal constitutional error can be deemed harmless beyond a reasonable doubt.[4]

### I.

On January 6, 2003, appellant's neighbor, Paula Weightman, went outside to

---

1. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

2. 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

3. *Davis v. State,* 169 S.W.3d 660, 673 (Tex. App.-Austin 2005).

4. We granted both of appellant's grounds for review:

   1. Review should be granted to resolve a conflict among the courts of appeals as to what constitutes "testimonial" evidence within the meaning of *Crawford v. Washington.*

   2. Review should be granted to clarify the circumstances in which federal constitutional error can be deemed harmless beyond a reasonable doubt.

   However, as noted *infra,* the State now concedes that the statements at issue in this case were testimonial, based on intervening case law. Thus we need address only the second issue.

smoke a cigarette and heard "bloodcurdling screams coming from the house across the street." She heard appellant's girlfriend, Patricia Ford, scream, "Get out, get out." Then she heard appellant yell, "I will show you," accompanied by hitting noises and "Ow." She called 911. After Austin police officers had responded to her call, she saw Ms. Ford come out of the house, and though she "couldn't really stand up, . . . she was trying to run." Ms. Weightman called Ms. Ford over and helped her onto Ms. Weightman's porch. Ms. Ford was trembling and holding her neck. She told Ms. Weightman, "He tried to kill me." Ms. Ford seemed to be in shock and couldn't even get up the porch steps without help. She had bruises and abrasions that ran along the bottom of her neck as if she were "wearing a necklace."

APD Officers Cortez and Canizales had responded to Ms. Weightman's 911 call. They heard appellant yelling and Ms. Ford screaming for help. Officer Cortez testified that he opened the door and told her to run out of the house. As Ms. Ford came out, she was screaming hysterically and grabbing at her face with her hands. He asked her if there were any weapons in the house, and she said there weren't. He then ordered appellant out of the house and handcuffed him. Officer Cortez stayed with appellant while Officer Canizales went across the street to Ms. Weightman's front porch to get Ms. Ford's side of the story.

Ms. Ford did not testify at trial. Over hearsay and confrontation objections,[5] Officer Canizales testified that Ms. Ford, still quite upset, told him the following: "[T]hat

morning she told Mr. Davis that he was going to have to go out and get a job or look for a job, and that started an argument between the two of them. During the argument he accused her of sleeping with somebody else." Although "she tried to get away from him, avoid him by walking to different rooms," he continued to follow her. When she tried to exit the house "she was grabbed by her shirt and pulled back into the residence and thrown on the couch." Appellant then "began to beat her about the face, about the head with his fists." He "put his thumbs into her eyes, and also pressed his fingers into the temples of her head." Appellant then "put his knee into her throat while she was still laying on the couch" and "told her that he was going to teach her about talking that way to him" and "threatened or told her that he was going to beat her."

Officer Canizales continued: According to Ms. Ford, appellant again accused her of seeing another man, so she took a cup of coffee and "tried to throw the coffee on Mr. Davis to get away from him, and he took the cup away from her." Appellant then "picked her up and threw her on the ground." She fell on her stomach and appellant put his knee in her back, then he took a rope, wrapped it around her neck, and pulled. "With his knee in her back, he pulled her by the rope around the neck and pulled her torso off the floor." Ms. Ford "pleaded with him and told him that she couldn't breathe," so appellant released her, ordered her to get her inhaler, and he "picked up the same rope that was around her neck and began to unravel it."

5. While appellant's direct appeal was pending, the United States Supreme Court delivered its decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The trial court therefore did not have the benefit of *Crawford* when making the decision of whether to admit Ms. Ford's hearsay

statements. The trial court held a hearing outside the jury to preview both officers' testimony, and, after considering the parties' arguments, ruled that Ms. Ford's "statement meets that reliability test that an excited utterance is designed to meet."

Ms. Ford again screamed, but appellant "choked her with his hands to keep her from screaming. She pleaded with him and promised not to scream." Finally, appellant "released her, and at that point she tried to run out of the front door and was pulled back in." Then the officers arrived.

Like Ms. Weightman, Officer Canizales noticed Ms. Ford's fresh injuries: there was blood on her lip and swelling on her head and neck. Those injuries were "consistent with what she told [him] had occurred." The State offered photographs of Ms. Ford which showed "redness around the neck." Pictures of the living room floor showed the rope that she said appellant used to strangle her. The rope itself was admitted as an exhibit. Two APD Victim Services workers also described Ms. Ford's injuries. In addition, the State offered into evidence Ms. Ford's medical records that described the injuries to her face and neck.

Appellant testified on his own behalf. He said that he and Ms. Ford got into an argument that escalated into a shouting match. He admitted hitting Ms. Ford, slapping the coffee out of her hand, and then slapping her in the face. He testified that he pushed her down on the couch and held his finger to her temple "and then something just said let her go and I just stopped." He denied grabbing her face and pushing his thumbs into her eyes, putting anything around her neck, or grabbing the rope. When asked about the presence of the rope on the living room floor, appellant said that he uses it to tie his lawn mowing tools (rakes, brooms, weed-eater and cords) together to put in the grocery basket that he uses to transport things.

In closing, defense counsel focused on the fact that the jurors had heard from his client, who had admitted simple assault, but that they had not heard from Ms. Ford. He noted the irony of the State wanting the jury "to believe beyond a reasonable doubt what Patricia Ford said when she wasn't here." The State, on the other hand, reminded the jurors that they had heard from Patricia Ford "through her statements to the officers."

The jury was instructed on both aggravated assault with a deadly weapon (appellant's hands or a rope) and simple assault. It convicted appellant of the greater offense. On appeal, appellant claimed that the trial court committed harmful error under *Crawford* when it admitted Ms. Ford's out-of-court statements. After setting out the emerging law under *Crawford,* the court of appeals concluded that it need not decide whether Ms. Ford's statements were testimonial.[6] Even if the statements

6. The court of appeals reasoned,
   The oral statements made by Ford to the uniformed Officer Canizales identified appellant and then, in a series of accusations against appellant, detailed blow by blow the assault made upon her. Surely, a reasonable 51–year–old declarant like Ford would have known that her accusations made to a uniformed police officer would be passed on to prosecutorial authorities to be used against appellant. Ford's statements may serve either or both of two primary objectives—to gain immediate official assistance in terminating an exigent situation and to provide information to aid investigation

   and possible prosecution arising from the situation. Merely because a declarant is excited, the statements made do not lose their character as testimonial statements subject to the Confrontation Clause.
   In the instant case, it is difficult to draw a definitive line between testimonial and non-testimonial hearsay evidence developed in this pre-*Crawford* trial in order to reach the proper disposition of this appeal. We find that we do not have to do so.
   If, in the instant case, the objected-to hearsay was nontestimonial, then no Confrontation Clause error is presented. If, on the other hand, the hearsay was testimoni-

were testimonial, any error in admitting them was harmless:

> If the complained-of hearsay was testimonial in nature, applying the *Van Arsdall* analyses, we conclude beyond a reasonable doubt that the error did not contribute to the conviction or punishment assessed. There is no reasonable likelihood that the error, if any, materially affected the jury's deliberations.[7]

The State acknowledges that, under *Wall v. State*,[8] Ms. Ford's out-of-court statements to Officer Canizales—which were made in circumstances objectively indicating that the emergency was over and the investigation had begun—were testimonial and thus erroneously admitted under *Crawford*.[9] We turn then to the remaining question of when federal constitutional error can be deemed harmless beyond a reasonable doubt.

## II.

In *Chapman v. California*,[10] the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."[11] The Court said that although "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error" not all "trial errors which violate the Constitution automatically call for reversal."[12] The Constitution gives the defendant the right to a fair trial, not a perfect one.[13] Thus, the harmless-error doctrine "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."[14]

The Supreme Court applied *Chapman* to a Confrontation Clause error of admitting evidence in *Harrington v. California*.[15] In that case, the trial court had admitted the confessions of two non-testifying co-defendants in violation of the defendant's Confrontation Clause rights. The Supreme Court held that this violation was subject to a *Chapman* analysis, and, because the evidence against the defendant was "so overwhelming" and the im-

---

al, then *Crawford* applies, and constitutional error occurred.
*Davis*, 169 S.W.3d at 672.

7. *Id.* at 673.

8. 184 S.W.3d 730 (Tex.Crim.App.2006).

9. State's Reply Brief at 11. *See also [Adrian Martell] Davis v. Washington*, — U.S. —, —————, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006) ("Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution").

10. 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

11. *Id.* at 24, 87 S.Ct. 824.

12. *Id.* at 23, 87 S.Ct. 824.

13. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

14. *Id.* (internal citation omitted).

15. 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

properly admitted evidence cumulative of the defendant's own inculpatory statement, the error was harmless.[16]

The Supreme Court later applied *Chapman* to a Confrontation Clause error excluding evidence in *Delaware v. Van Arsdall*.[17] In *Van Arsdall*, the trial court improperly prevented defense counsel in a murder case from cross-examining a prosecution witness to show his bias. The proposed cross-examination concerned an agreement that the witness had made to tell the prosecutor about the murder in exchange for dismissing his unrelated criminal charge of drunkenness.[18] The Supreme Court held that the defendant's constitutional right to confront and cross-examine the witness for bias was violated, but, like other Sixth Amendment errors, this error in excluding evidence was subject to a harmless-error analysis:

the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.[19]

Thus, when a trial court unconstitutionally restricts cross-examination, the reviewing court first assumes that "the damaging potential of the cross-examination" had occurred (*e.g.*, the prosecution witness in *Van Arsdall* had been fully impeached with his agreement with the State). The reviewing court then asks: Would the admission of that impeachment evidence, in the context of the trial as a whole, likely have made any significant impact upon the minds of an average jury?[20] To decide that question, the Court set out a number of non-exclusive factors, including:

(1) The importance of the witness's testimony in the prosecution's case;

(2) Whether the testimony was cumulative;

(3) The presence or absence of evidence corroborating or contradicting the witness's testimony on material points;

(4) The extent of cross-examination otherwise permitted; and

(5) The overall strength of the prosecution's case.[21]

Most of these factors apply regardless of whether the constitutional error was in the admission or exclusion of evidence. But the initial "assumption" that the damaging potential of the cross-examination had been realized applies only when the trial

---

16. *Id.* at 254, 89 S.Ct. 1726. The Supreme Court stated, "Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury." *Id.*

17. 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

18. *Id.* at 676, 106 S.Ct. 1431.

19. *Id.* at 684, 106 S.Ct. 1431; *see also Olden v. Kentucky*, 488 U.S. 227, 232, 109 S.Ct. 480,

102 L.Ed.2d 513 (1988) (applying *Van Arsdall*).

20. *Harrington*, 395 U.S. at 254, 89 S.Ct. 1726; *see Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) (concluding "that the 'minds of an average jury' would not have found the State's case significantly less persuasive" had the improperly admitted testimony been excluded).

21. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431.

court restricts cross-examination or excludes evidence. In those instances, the reviewing court must determine whether it is convinced, beyond a reasonable doubt, that the fact-finding process was reliable even if the improperly restricted or excluded evidence is factored into the analysis. But when the error involves the *admission* of evidence in violation of the Confrontation Clause, reviewing courts may not speculate as to whether cross-examination would have been effective or not, had it occurred.[22]

In *Shelby v. State*,[23] we adopted the *Van Arsdall* analysis for assessing harm when the trial court improperly limited the scope of cross-examination of the complainant's mother about a lawsuit she filed against the defendant and others after she had reported an aggravated sexual assault to the police.[24] Since then, this Court has applied the *Van Arsdall* analysis to errors of excluding evidence or restricting cross-examination.[25] Texas courts of appeals have likewise applied *Van Arsdall* and *Shelby* to errors of exclusion.[26]

■ Some Texas courts have also applied *Van Arsdall* or *Shelby*, with the assumption that the purposes of cross-examination were fully met, to improperly admitted evidence.[27] But when a witness

22. See *Coy v. Iowa*, 487 U.S. 1012, 1022, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). In *Coy*, the Supreme Court considered an Iowa statute that allowed the placement of an opaque screen between the defendant charged with sexual assault and his two teenage victims. The Court held that the defendant's right to face-to-face confrontation was violated since the screen allowed the complaining witnesses to avoid viewing the defendant as they gave their testimony. Nevertheless, the court agreed that, like the other Confrontation Clause violations, this one was subject to the *Chapman* harmless-error analysis, but it noted that "[a]n assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Id.* at 1021–22, 108 S.Ct. 2798.

23. 819 S.W.2d 544 (Tex.Crim.App.1991).

24. *Id.* at 547.

25. See, e.g., *Love v. State*, 861 S.W.2d 899, 907 (Tex.Crim.App.1993) (finding that Confrontation Clause error in restricting cross-examination was harmful under *Van Arsdall* and *Shelby*; noting that the "precluded evidence cast doubt on the reliability of the breath test result and discredited some testimony" by expert in DWI trial); *Young v. State*, 891 S.W.2d 945, 948–49 (Tex.Crim.App.1994) (stating that *Van Arsdall*, as adopted in *Shelby*, guides the harmless error analysis for the improper exclusion of evidence under evidentiary rules as well as constitutional rules).

26. See, e.g., *Fox v. State*, 115 S.W.3d 550, 569 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (finding harmful error under *Van Arsdall* when trial court prevented cross-examination that would have shown outcry witness's bias against defendant); *Draheim v. State*, 916 S.W.2d 593, 600–01 (Tex.App.-San Antonio 1996, pet. ref'd) (stating that "[i]f 'the damaging potential of the cross-examination were fully realized,' the jury would have been informed that E.S. had been sexually abused by her brother since she was two and later by her father and that this repeated abuse had resulted in symptoms identical to those exhibited by E.S. following Draheim's assault"; holding that "the trial judge acted within the ambit of his considerable discretion in excluding the proffered testimony," but that even if he hadn't, the error was not harmful error under the test set forth in *Van Arsdall* ).

27. For example, in *Rodriguez v. State*, 926 S.W.2d 379, 381 (Tex.App.-San Antonio 1996, no pet.), the court applied the *Van Arsdall* assumption to the error admitting a statement given by a non-testifying eyewitness to the police in a pre-trial investigation. And in *Gutierrez v. State*, 150 S.W.3d 827, 831 (Tex. App.-Houston [14th Dist.] 2004, no pet.), the *Van Arsdall* analysis and assumption were applied to a *Crawford* error. In *Gutierrez*, the court found constitutional error in the admis-

does not testify at trial, it is difficult, if not impossible, to gauge how cross-examination might have impeached his in-court testimony, what bias he might have admitted to, what inconsistent statements he might have made during his testimony, how his demeanor might have affected the jury, and so forth. As the Supreme Court has stated, "such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence," while putting aside the out-of-court declarant's testimony.[28]

We therefore take this opportunity to clarify that the *Van Arsdall* initial assumption ("that the damaging potential of the cross-examination were fully realized") applies to confrontation errors of exclusion, not confrontation errors of admission. On the other hand, most of the non-exclusive list of factors set out in *Van Arsdall* may well be applicable in analyzing whether constitutional error in the admission of

evidence is harmless under a *Chapman* analysis.

■■■■■ Thus, courts reviewing whether the error in admitting out-of-court statements in violation of *Crawford* is harmless beyond a reasonable doubt should consider:

(1) The importance of the hearsay statements to the State's case;

(2) Whether the hearsay evidence was cumulative of other evidence;

(3) The presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and

(4) The overall strength of the prosecution's case.[29]

Of course courts may consider other factors as well, but, in the final analysis, the reviewing court must be convinced, beyond a reasonable doubt, that the admission of *Crawford*-barred testimony would probably not have had a significant impact on the mind of an average juror.[30] Put anoth-

sion of an informant's hearsay statement in which he explained that the defendant, a pharmacist technician for a hospital, would steal drugs from the hospital and sell them to the informant, who then resold them. In assessing harm, the court applied *Van Arsdall*, and stated, "In applying this test, we focus on [the informant] Felan's statement and assume that the damaging potential of the cross-examination was fully realized. We assume that appellant would have been permitted to fully cross-examine Felan and, thus, had the opportunity to discredit Felan as a witness. With that assumption in mind, we review the error in connection with the following five factors...." *Id.*

**28.** *Coy*, 487 U.S. at 1022, 108 S.Ct. 2798.

**29.** *See Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431. The fourth *Van Arsdall* factor—the extent of cross-examination otherwise permitted—is, like the initial assumption, inapplicable in the context of *Crawford*-barred hearsay

statements which, by definition, were subject to no cross-examination.

**30.** *See Harrington*, 395 U.S. at 254, 89 S.Ct. 1726; *Schneble*, 405 U.S. at 432, 92 S.Ct. 1056; *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991) ("To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record"); *see also People v. Patterson*, 217 Ill.2d 407, 299 Ill.Dec. 157, 841 N.E.2d 889, 906 (2005) (applying *Chapman* analysis to *Crawford* error and finding it harmless); *People v. Houston*, 130 Cal.App.4th 279, 301, 29 Cal.Rptr.3d 818 (2005) (even if admission of murder victim's statements to medical personnel was *Crawford* error, it was harmless under *Chapman* because there was overwhelming evidence of his guilt and the statements were largely tangential and cumulative of other evidence); *Davis v. United States*, 848 A.2d 596, 599–600 (D.C.2004) (concluding that error in admitting *Crawford*-barred testi-

er way, is there a reasonable possibility that the *Crawford* error, within the context of the entire trial, "moved the jury from a state of non-persuasion to one of persuasion" on a particular issue? [31] With those general legal principles in mind, we turn to the question of whether the erroneous admission of Ms. Ford's out-of-court testimonial statements to Officer Canizales was harmless beyond a reasonable doubt.

### III.

■ In this case, the court of appeals applied a modified *Van Arsdall* analysis. The court cited the entire *Van Arsdall* test, but it did not apply the double assumption that 1) Ms. Ford testified, and 2) appellant was able to fully cross-examine her to show any bias.[32] In a footnote, the court correctly noted that, "The *Van Arsdall* factors in the second prong of the analyses were developed in light of the particular facts there presented.... Like factors in other contexts, the *Van Arsdall* factors do not always present a 'one shoe fits all' analysis easily applied to every case." [33] Applying what it found to be the applicable factors, the court stated,

In applying the *Van Arsdall* factors to the facts of the instant case, we find that the hearsay testimony involved was vital to the State's case. Without it, the State could not have established the elements of the offense. However, appellant made a judicial confession corroborating much of the declarant's statements to Officer Canizales. Appellant confirmed the background evidence of his relationship with Ford, the

declarant. He admitted that he started the shouting match and assaulted the declarant and acknowledged that he inflicted the injuries shown in a photograph of the declarant. While appellant's version of the assault did not exactly match that of the declarant as revealed by Officer Canizales's testimony, the evidence clearly supported the general verdict of the jury.[34]

In large part, we agree with the court of appeals. We disagree, however, with that court's statement that the State could not have established the elements of aggravated assault without Ms. Ford's testimonial hearsay. Appellant argues that Ms. Ford's testimonial statements were "vital to the State's case," and claims that "[t]he *only* evidence offered by the State to prove the deadly weapon element was Officer Canizales's testimony about hearsay statements by Ms. Ford. Without that testimony, 'the State could not have established the elements of the offense.' " [35] It is true, as appellant asserts, that he "never admitted the use of a deadly weapon, as alleged in the indictment. To the contrary, he explicitly denied choking Ms. Ford, pressing his thumbs into her eyes or placing a rope around her neck." [36]

But appellant overstates things when he says that the only evidence to support the deadly weapon finding was Ms. Ford's testimonial statements to Officer Canizales. As the State recognizes, "other evidence at trial showed that [appellant] attempted to

mony was not harmless beyond a reasonable doubt under *Chapman* ).

31. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App.2000).

32. *Davis*, 169 S.W.3d at 672–73.

33. *Id.* at 673 n. 8 (citing *Hale v. State*, 139 S.W.3d 418, 422 (Tex.App.-Fort Worth 2004,

pet. filed), and *Scott v. State*, 165 S.W.3d 27, 48 (Tex.App.-Austin 2005, pet. granted)).

34. *Id.* at 673.

35. Appellant's Brief at 17 (quoting *Davis*, 169 S.W.3d at 673).

36. *Id.* at 18.

strangle the victim with a ligature." [37] That evidence included the following:

- Paula Weightman testified that, when Ms. Ford came running out of her house, she was "holding her neck" and said "He tried to kill me." [38] Ms. Weightman said that Ms. Ford's voice was "hoarse." Ms. Weightman remembered "seeing bruises ... seeing the mark around her neck." "It looked between an abrasion and a hematoma." She indicated the linear injury to the jury by drawing a line with her finger around the base of the neck. She noted that on the day after the assault (as well as a week after the assault), Ms. Ford "was bruised and swollen." The injuries were "more visible" as they had "gotten darker."

- Officer Canizales observed "a big knot on the side of [Ms. Ford's] face, there was blood on her lip, and there was redness on her neck." He testified that the injuries appeared to be consistent with injuries caused by a rope like that found at the scene being pulled against her neck.

- Photographs of Ms. Ford showed "redness around the neck"; another photo showed a rope on the floor in the living room.[39]

- The rope itself was admitted as an exhibit.

- An APD Victim Services crisis intervention responder testified about Ms. Ford's injuries. He noticed "swelling on her cheek" as well as "scratches on her face and on her neck." He agreed that the injuries were "consistent with strangulation by a rope."

- A second APD Victim Services worker who visited Ms. Ford the day after the assault testified that she had "an obvious black eye or bruising to her face. She also had very, very dark bruising around her neck."

- An APD homicide detective testified as a strangulation expert and said that "victims of a choking will have difficulty speaking, will be hoarse. Voices will be strained. Sometimes they will cough." He stated that "Ligature injuries to the neck tend to be very linear." He also testified that the rope admitted as an exhibit could have been used as a deadly weapon.

- Medical records were admitted that described injuries to the right side of Ms. Ford's face and neck, as well as the assault itself. The unobjected-to EMS records contain an entry that state that the patient was assaulted with "hand blows to the face and a rope was tied around her neck." The unobjected-to hospital records contain notes indicating that Ms. Ford's live-in boyfriend tried "to strangle her with a cord," was "beating her up," and "proceeded to beat her and attempt to choke her." [40]

- Appellant testified and agreed that Ms. Ford did not have any bruises before their fight. And though he denied strangling Ms. Ford with his

---

**37.** State's Reply Brief at 13.

**38.** This statement was admitted as an excited utterance and appellant does not suggest that it is testimonial under *Crawford.*

**39.** The copies of the photographic exhibits are fuzzy, but Officer Canizales described them for purposes of the record.

**40.** These records came into evidence with "No objection" from the defense. As the State points out, the records contain information about Ms. Ford's mental-health issues. Though the State had wanted this information redacted, the court let it in so that the jury could consider it "in determining credibility of a non-testifying witness."

hands or a rope, he stated that the injuries in the photos of Ms. Ford reflect the injuries that he inflicted on her.

Although Ms. Ford's testimonial statements concerning how appellant had attempted to strangle her with a rope were assuredly "important" to the State's case, they were also cumulative of significant other evidence which proved that same fact. There was ample other evidence that corroborated her hearsay statements, and the only evidence contradicting the allegation that appellant attempted to strangle her was his flat denial. He had, however, no other explanation for the rope-mark bruises around the base of her neck and he admitted that he had caused her injuries. Where could the neck injuries have come from if not from the rope left lying on the living room floor? These injuries speak for themselves. Taken as a whole, the non-testimonial, admissible evidence showing that appellant used a rope as a deadly weapon in attempting to strangle Ms. Ford is overwhelming.

One could argue that appellant might never have testified had Ms. Ford's testimonial statements not been improperly introduced. First, this is not an argument appellant has ever made, either in the trial court or on appeal. Although appellant could have told the trial court that he was calling his client to testify solely to rebut and explain the inadmissible hearsay of-

fered by the State,[41] he did not do so. Second, this argument requires the reviewing court to speculate as to how the parties' trial strategy and tactics might have been different had the trial court made different evidentiary rulings than the ones it did make. Just as we may not speculate as to the possible efficacy of cross-examination had it occurred, we cannot speculate as to whether appellant would have testified had the trial court disallowed Officer Canizales's testimony concerning Ms. Ford's statements.[42] Third, without appellant's testimony, nothing in the record would support his position that he did not use a deadly weapon when he assaulted Ms. Ford. That is, the only evidence relative to the use of a deadly weapon would be that which tended to prove that appellant used a rope to strangle Ms. Ford.

Appellant does claim that the State made "artful use of the wrongly admitted testimony" by arguing to the jury that Ms. Ford was more credible because her testimony was presented as an excited utterance: "The law presumes that you are incapable of making something up because you are so traumatized by that event that all you can do is blurt out what happened. That's why you have her statements to Officer Canizales." That, of course, is not an entirely correct statement of the law, but appellant did not object to it. Furthermore, that same rationale applies to

41. *See, e.g., Leday v. State,* 983 S.W.2d 713, 718–19 (Tex.Crim.App.1998) (holding that defendant's testimony which is "impelled by State's introduction of evidence that was obtained in violation of law" does not constitute a waiver of his prior objection).

42. In a similar, but reverse, situation, the Supreme Court has held that a defendant who declines to testify cannot complain on appeal that the trial court's *in limine* ruling permitting cross-examination with prior convictions under Fed.R.Evid. 609 was erroneous. *Luce v. United States,* 469 U.S. 38, 41–42, 105 S.Ct.

460, 83 L.Ed.2d 443 (1984) (concluding that any possible harm from the trial court's ruling was speculative because the defendant did not testify; rejecting the argument made on appeal that the defendant would have testified had he been able to do so free from impeachment with prior convictions and noting, "Because an accused's decision whether to testify 'seldom turns on the resolution of one factor,' a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify") (internal citation omitted).

the properly admitted excited statements to Ms. Ford's neighbor and to the properly admitted statements made for medical purposes to the EMS and hospital personnel. Appellant argues that the State simply did not want Ms. Ford to testify because she could be cross-examined with the fact that she had a criminal record and mental health problems. Although she could be cross-examined with such material, neither a criminal record nor mental health problems would account for the rope-mark bruises on her neck, and it is solely the "deadly weapon" element appellant disputes. One could vigorously and extensively cross-examine Ms. Ford, but the rope-mark bruises would still be on her neck, and there is no alternate explanation for them, not even a hypothetical one.

In sum, we agree with the conclusion of the court of appeals that the *Crawford* error in this case was harmless beyond a reasonable doubt. We affirm its judgment.

WOMACK, J., filed a dissenting opinion in which PRICE and JOHNSON, JJ., joined.

WOMACK, J., dissenting in which PRICE and JOHNSON, JJ., joined.

The Court's opinion shows on its face that most of the evidence about the alleged offense was Officer Canizales's testimony about what Patricia Ford told him. It literally was her blow-by-blow account of events that the officer did not see—events that happened when only Ms. Ford and the appellant were there.

The officer's hearsay testimony was introduced in violation of the Sixth and Fourteenth Amendments, as the Supreme Court was to hold after this case was tried.

It could be harmless error only if one is "convinced, beyond a reasonable doubt, that the admission of [such evidence] would probably not have had a significant impact on the minds of an average jury."[1]

This Court, like the Court of Appeals, finds the constitutional error harmless beyond a reasonable doubt, in part because of the appellant's testimony. Neither court has considered whether the appellant would have testified at all if the State's most important evidence had been excluded as the Constitution required.

For that reason, and because of the sheer volume of relevant detail in the erroneously admitted evidence, I cannot say, as the Due Process Clause requires, that "the State has met its burden of demonstrating that the admission of the [evidence in violation of the Constitution] did not contribute to [the appellant's] conviction."[2]

I would reverse the judgments below so that this case could be tried as the Constitution requires. I respectfully dissent.

---

1. *Ante,* at 853.

2. *Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (opinion of White, J., for five justices)