**AFFIRMED and Opinion Filed September 28, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00768-CR**

**GORDON ALAN KIRK, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1541871-M**

## MEMORANDUM OPINION

Before Chief Justice Burns and Justices Pedersen, III, and Evans
Opinion by Chief Justice Burns[1]

Gordon Alan Kirk appeals his continuous sexual assault of a young child conviction. A jury convicted appellant and sentenced him to forty-five years' confinement. In eight issues, appellant argues the evidence is legally insufficient to support his conviction; the trial court erred in overruling his objection to the admission of an extraneous offense, overruling his "objection to the statement proffered by the State on an irrelevant prejudicial evidence of prior bad conduct or

---

[1] The Honorable David Bridges, Justice, participated in the submission of this appeal; however, he did not participate in the issuance of this opinion due to his death on July 25, 2020. Chief Justice Burns has reviewed the record and the briefs in this cause.

extraneous offense that the defendant had been to prison," overruling his motion for mistrial, "overruling the State's proffered hearsay written statement of the complainant," and overruling his objection to prejudicial hearsay proffered by the State to bolster the testimony of one of the complainants; penal code section 21.02 is unconstitutional because it does not require jurors to be unanimous; and penal code section 21.02(b) and government code section 508.145(a) are unconstitutional as violative of the prohibition against cruel and unusual punishment and the guarantee of equal protection. We affirm the trial court's judgment.

In December 2015, appellant was charged by indictment with continuous sexual assault of a young child. The indictment alleged the following:

> That Gordon Alan Kirk, hereinafter called Defendant, on or about 1st day of November, 2012 in the County of Dallas, State of Texas, did then and there intentionally and knowingly, during a period that was 30 or more days in duration, when the defendant was 17 years of age or older, commit two or more acts of sexual abuse against [K.M.], a child younger than 14 years of age, hereinafter called complainant, namely by: the contact and penetration of the complainant's anus by the Defendant's sexual organ AND by contact between the mouth of the complainant and the sexual organ of the Defendant.

Prior to trial, the trial court conducted a hearing outside the presence of the jury at which M.E. testified she was born in December 2005 and was thirteen years old at the time of trial. M.E. testified appellant was her "stepdad's best friend." In June 2014, when M.E. was eight years old, her mother left her and her sister at appellant's house "right before the sun came up." M.E. got bored and asked appellant to play a game. Appellant found a game on his computer. The game involved putting food

in a bag without opening the bag and trying "to taste the food and guess what it is." To play the game, while blindfolded "you have to suck on the bag but not bite it." M.E. pulled the blindfold down, but she could still "see like the bottom where your nose is." When the game started, appellant "pulled down his pants, and he put his penis in [M.E.'s] mouth." M.E. could see through the blindfold what looked like "the top of probably a plum or a peach," and it felt "squishy." Appellant told M.E. to "suck harder to open the bag" and "said don't bite." Appellant left the room to get more food, came back, and the game started again. M.E. testified "it was his penis" that appellant put in her mouth the second time. M.E. said "it tasted funny, so [appellant] went to get [her] a cup of water." The game ended, and appellant told M.E. "not to tell anybody about the game."

The prosecutor argued M.E. testified to the elements of an aggravated sexual assault. Under article 38.37, the prosecutor argued M.E.'s testimony "should be admitted for any purpose relevant to the defendant's character and acts performed for any reason the jury might find it relevant or useful in their determination of the case in chief." Defense counsel objected that M.E. did not identify appellant as "the person that forced her to play this food game." The prosecutor stated she had other witnesses to "shore up the connection." The State called M.E.'s mother, who testified appellant was her husband's best friend, and she took M.E. to appellant's house early on June 16, 2014. M.E.'s mother identified appellant in court.

At the conclusion of the hearing, the trial court made the following oral finding:

> Court finds under section (2)(a) of Code of Criminal Procedure Article 38.37 hearing outside the presence of the jury that the evidence that has been presented is likely – will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt. Therefore, it will be admitted.

At trial, K.M. testified she was born in August 1999 and was nineteen years old at the time of trial. Appellant was a friend of K.M.'s parents, and K.M. knew appellant since she was in the fourth or fifth grade. K.M. went to "little get-togethers" at appellant's house with her parents and brother, and appellant came to K.M.'s house "on a holiday." Prior to the time when K.M. was in seventh grade, appellant watched K.M. and her brother for a day when K.M.'s parents were away at a softball tournament. K.M. did not remember another time that she spent time with appellant without her parents or grandparents.

When K.M. was in seventh grade, she had trouble with math, and appellant offered to help K.M. with her homework. K.M. accepted appellant's help because she did not want to stay after school. The first time appellant helped her with homework was the first time K.M. had ever been "one on one alone with him." When they got to appellant's house, appellant "pulled out [K.M.'s] homework and helped [her] with it" at his dining room table and then took K.M. home. The next time appellant brought K.M. to his house, they "just hung out" and played video

–4–

games in appellant's living room. After playing video games, appellant told K.M. to go to the computer room, and he "followed [her] in and closed the door."

Appellant told K.M. in a "stern" voice to take her clothes off. K.M. initially thought, "Why?" but she took off her clothes and underwear. Appellant sat on the computer chair and pulled down his shorts and told K.M. "to get on her knees" and "suck." K.M. "did as [she] was told" but she "was scared" that appellant would physically hurt her. Appellant "had to tell [K.M.] how to do it." When asked to clarify what body part K.M. was talking about, she testified it was "his penis" that went in her mouth. Appellant moved, and K.M. "lifted [her] head off." Appellant had [K.M.] bend over, and he "positioned himself and slowly eased his penis into [K.M.'s] butt." The experience was the "worst pain ever," and "felt like that went on for a long time." Afterward, appellant told K.M. to clean up in the bathroom where she noticed she was "bleeding" from her "butt area," and the bleeding "wouldn't stop." After getting dressed, K.M. told appellant her "butt was bleeding and it hurt," and appellant said "It always hurts the first time." Appellant "just took [K.M.] home, told [her] not to tell anyone." When asked if she "thought about telling anybody," K.M. testified, "I wanted to, but I was scared. He boasted about how he went to prison, he knew people in prison."

The first sexual assault took place on a Monday, and "the same thing" happened the next Monday and "most but not all Mondays" except for "the days where [K.M.] faked being sick so [she] didn't have to go to school." K.M. testified

she faked being sick because it was a "rule in the house" that, if she was sick, she had to stay in her room in bed until the next day. Sometimes when K.M. faked being sick, appellant came over to pick her up, but she "wouldn't go with him because [she] was sick." The abuse continued from the fall of seventh grade in 2012 until the spring of eighth grade when appellant "proposed to his girlfriend." The prosecutor confirmed that K.M. was thirteen years old in the fall of 2012 when the abuse began and still thirteen when she finished seventh grade because her birthday is in August. During the time when appellant was abusing K.M., appellant was "in his 30s."

The prosecutor asked K.M. to "describe to the jury anything different that [she] hadn't already talked about." K.M. testified appellant filmed her with his phone while she was performing oral sex. When K.M. asked about the filming, appellant "didn't say much, but it turns out he was using the videos to sell to a dude" and "to get money to pay for things he said he would buy [K.M.]." K.M. testified appellant filmed her "ten to 15 times."

In the fall of 2015, K.M. had "not seen or heard from" appellant, so she thought it would be safe to tell about the abuse. A family friend who was "kind of a second dad" to K.M. was living in K.M.'s garage, and K.M. told him about the abuse. K.M. also called her mother and told her about the abuse. The next night, K.M. went to the police station with family members and reported the abuse. After

reporting the abuse, K.M. learned that appellant was "on bond for another sexual offense."

M.E., thirteen years old at the time of trial, testified she "knew [appellant] by [her] stepdad." M.E. was born in December 2005, and she was eight years old when she moved to Texas. M.E. often went over to the house of appellant's girlfriend. Appellant was also at the house, and M.E. thought appellant was "strange and kind of scary" and "looked kind of dark." On a day in June 2014, M.E.'s parents were having a fight, and M.E.'s mother "wanted to go to a different house," so she took M.E. and her sister to appellant's house at six or seven in the morning. M.E. thought her mother talked to appellant before leaving. M.E. and her sister went in appellant's room and watched television and fell asleep. When M.E. woke up, she "went around the house and started finding something to do" before eventually going back into appellant's room and lying down with her sister. Appellant eventually made M.E. a snack, and M.E. asked appellant if they could play a game. In the computer room, appellant "went to the computer and pulled up a list of games" and "chose a game." M.E. did not know the name of the game, but appellant "went in the kitchen and got food or started looking for a blindfold."

Appellant told M.E., "you got to try to get the food out of the bag. You can't see the food." M.E. testified the rules of the game were "You can't see what's inside the bag, and you can't bite. And you have to suck on the bag to get the food out." Appellant brought food into the room and Ziploc bags and M.E. tied a t-shirt over

–7–

her eyes as a blindfold. M.E. testified she could see out of the blindfold "down where your nose is." The game started, and M.E. "heard some kind of like messing with the bag." Something went in M.E.'s mouth, and she looked down through the blindfold and saw appellant's penis. At the time, M.E. did not know it was appellant's penis, and she testified it "looked like the top of a plum or a peach" and was "like a bright pink." M.E. did know "it didn't look like a bag." Appellant told M.E. to "suck hard to taste the food," but it "[d]idn't really taste like anything."

Appellant stopped the game and went out of the room to get more food. While appellant was gone, M.E. put a bag of marshmallows in her mouth "to see if it felt the same way, and it didn't." M.E. "kind of got curious to know what it was." Appellant came back in the room, and they started the game again. M.E. testified the game stopped when she asked for a cup of water. Appellant brought a cup of water, and the game stopped. Appellant said, "don't tell anybody." M.E. left the room and "felt weird and not normal" and "felt like something bad had just happened."

M.E.'s mother came and picked up M.E. and her sister and took them back home. M.E. and her sister went to a park, and M.E. said she asked appellant to play a game and "that something went in [her] mouth" that she described as "a long manly part." M.E.'s sister understood and said they had to "tell Mom and Dad." M.E. was "scared" because she "felt like [she] was going to get in trouble." The two went home, and M.E. "ran up to [her] room and wanted to hide" while her sister told her

parents what had happened. M.E. testified she thought her mother went to the police station, and M.E. had to "go and talk to another person about this." The jury convicted appellant of continuous sexual assault of a young child, and this appeal followed.

In his first issue, appellant argues the evidence is legally insufficient to support his conviction.

Appellant was charged with continuous sexual abuse of a child pursuant to section 21.02 of the Texas Penal Code. Section 21.02 provides, in pertinent part:

(b) A person commits an offense if:

(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

....

(d) If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

TEX. PENAL CODE ANN. § 21.02.

In determining the sufficiency of the evidence, the reviewing court considers the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a

reasonable doubt. *Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014). The jury is the sole judge of the credibility and weight to attach to witness testimony. *Jackson v. Virginia*, 443 U.S. 307, 319, (1979). The testimony of a child victim alone is sufficient to support a conviction for continuous sexual abuse of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a).

Here, K.M. testified appellant sexually assaulted her over a period of months when she was thirteen years old and appellant was in his 30s. K.M. provided detailed testimony of the abuse, and the jury was free to believe her testimony. We conclude the evidence was sufficient to enable the jury to find the essential elements of the offense of continuous sexual assault of a young child beyond a reasonable doubt. *See Acosta*, 429 S.W.3d at 624–25; *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017, no pet.). We overrule appellant's first issue.

In his second issue, appellant argues the trial court erred in overruling his objection to the admission of an extraneous offense. Specifically, appellant complains of the admission of M.E.'s testimony.

We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.*

Under the Texas Rules of Evidence, evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith." *De La Paz v. State*, 279 S.W.3d 336, 342 (Tex. Crim. App. 2009). But it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* TEX. R. EVID. 404(b); *De La Paz*, 279 S.W.3d at 342-43.

Article 38.37, entitled "Evidence of extraneous offenses or acts," is an evidentiary rule applicable to certain types of sexual abuse cases including sexual assault of a child, indecency with a child, and continuous sexual abuse of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37. It supersedes application of Rule 404(b), making admissible extraneous offense evidence that Rule 404(b) does not. *See id.* §§ 1(b), 2(b). Article 38.37 allows the jury to consider that evidence's bearing on "relevant matters," including the state of mind of the defendant and the child, the previous and subsequent relationship between the defendant and the child, and the character of the defendant and acts performed in conformity with the character of the defendant. *See id.*

Section 2 provides evidence that a defendant committed a separate offense may be admitted for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant. *Id.* §2. Section 2-a requires the trial court to determine that evidence

–11–

likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt. *Id.* §2-a.

Appellant argues, without more, that the extraneous offense evidence "would not have met the 'beyond a reasonable doubt' test and did not meet the '403' balancing test. On the contrary, the record shows the State properly gave appellant notice of the extraneous offense against M.E., conducted a hearing outside the presence of the jury, and determined that evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt. The requirements of section 2-a were thus fulfilled, and the trial court properly admitted the extraneous offense evidence under section 2 for any bearing the evidence had on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant. *Id.* §2. Further, appellant did not make a 403 objection. We conclude the trial court did not abuse its discretion in permitting M.E. to testify. See *Martinez*, 327 S.W.3d at 736. We overrule appellant's second issue.

In his third issue, appellant argues the trial court erred in overruling his "objection to the statement proffered by the State on an irrelevant prejudicial evidence of prior bad conduct or extraneous offense that the defendant had been to prison." The evidence that appellant had "been to prison" came in without objection during K.M.'s testimony. K.M. testified without objection that appellant "boasted about how he went to prison, he knew people in prison." Accordingly, any error in

–12–

admitting the testimony that appellant had been to prison was cured. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (any error in admitting evidence is "cured where the same evidence comes in elsewhere without objection"). We overrule appellant's third issue.

In his fourth issue, appellant argues the trial court erred in overruling his motion for mistrial. Specifically, appellant complains of the testimony of M.E.'s mother when she was asked if she had ever heard appellant "boast about his toughness," and she testified that appellant told her he was "one of the biggest drug dealers in Dallas." Defense counsel objected, and the trial court sustained the objection and instructed the jury to disregard. Defense counsel asked for a mistrial, and the trial court denied the request.

We review the denial of a mistrial motion for abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). A mistrial is the trial court's remedy for error that is "so prejudicial that expenditure of further time and expense would be wasteful and futile" and is required only in extreme circumstances where the prejudice is incurable. *Id.* A prompt instruction to disregard will ordinarily cure error associated with an improper question and answer. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *see also Hawkins*, 135 S.W.3d at 77 ("In effect, the trial court ... determin[es] whether improper conduct is so harmful that the case must be redone. Of course, the harm analysis is conducted in light of the trial court's curative instruction."). "We generally presume the jury follows the trial court's

instructions in the manner presented." *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

Here, the record shows the jury heard K.M.'s extensive and explicit testimony concerning appellant's continuous sexual abuse of her when she was a thirteen-year-old child. M.E.'s reference to appellant's boast about being a drug dealer was isolated and immediately subject to the trial court's instruction to disregard. On this record, we conclude the trial court did not abuse its discretion by determining the complained-of testimony was not so extreme as to be incurable by an instruction to disregard. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (whether error requires mistrial must be determined by case's particular facts). We overrule appellant's fourth issue.

In his fifth issue, appellant argues the trial court erred in "overruling the State's proffered hearsay written statement of the complainant, thereby bolstering her in-court testimony." Specifically, appellant complains of the admission of K.M.'s "trauma narrative" created during her therapy at Dallas Children's Advocacy Center. The single-page "trauma narrative" stated the following:

Chapter 1 – Before the Abuse

I was 13 and in middle school. I was quiet and talkative. I like to read books, play on the computer and hang out with my friends. My grandpa had lung cancer and passed away. My parents had gotten divorced.

Chapter 2 – The Abuser

Gordon was a high school friend of my parents. He said he had known me since I was born. He played that sweet, innocent, helping card. He

–14–

did things for the family. I believed he was going to help me with homework.

Chapter 3 – The Abuse

He took me to his house and we ended up playing video games, Assassin's Creed. I said how cool it would be if it was real. He said it is and the next thing I remember is him telling me to take off all my clothes. I thought he was crazy and weird. I had to listen to him. I had no choice. He always talked about how he was the top dog in prison. I was afraid he would get the bad people he knew to hurt me or my family. He took off his pants and made me do oral. And then after, he did anal to me. Then once it was over he said he was going to take me home and told me to never tell anyone. I remember the last time was just oral. That was when my grandpa was really sick. Then after my grandpa's funeral, Gordon stopped coming around. I thought it was safe to tell so I did. I'm glad I told.

Chapter 4 – After the Abuse

Since the abuse, I don't like to go places alone like the park, mall or restaurants. I get nervous and my chest feels tight. I am very aware of my surroundings and people, especially men.

Chapter 5 - Moving Forward

I'm sad the abuse happened. It wasn't my fault for trusting him. He abused my trust. He took advantage of me. I still feel vulnerable when I am alone somewhere and I don't like being the center of attention. Deep breathing, reading a book, and talking to friends helps. I'm getting better.

I am respectful, caring for others, focused, smart and not easily influenced by others. I am someone who helps you through hard times. I am my own person.

With the jury present, Tama Walley, K.M.'s therapist at the Dallas Children's Advocacy Center, testified one of the methods of treatment she used with child victims of sexual abuse was Trauma Focused Cognitive Behavioral Therapy. Walley testified this type of therapy helps clients understand that "thoughts and our

–15–

feelings are connected to our behavior" and how "guilt like blaming themselves" is "an obstacle towards them healing." Walley testified trauma focused therapy is "very specific to children, even specific to abuse and sexual abuse," and it has "certain stages and steps."

Walley testified the first step is "psycho-education" because many children do not know "that what was happening was abuse." After the first step, "there's a component of relaxation" to "teach the child skills to be able to find a state of relaxation or calmness so that they can help their body and their brain to be connected in a way that is healthy." At this point in the therapy, Walley testified, "we start working with emotions and help the child identify emotions and also have skills to work with those uncomfortable emotions." After that, "the child has an opportunity to write their story about what happened to them in their own words as a way to kind of unpack and not feel like they have to carry this story around on their own, know that they're . . . supported." This written story is called a "trauma narrative." Walley testified the trauma narrative comes "kind of at the end to help provide closure for the therapy," and its purpose "is for the healing of the child." When asked to describe the purpose of the trauma narrative, Walley testified as follows:

> So oftentimes when we experience a traumatic event, we will, in our mind, create this negative story about ourselves, right? Like I said, "Maybe it was my fault or "I'm" – "I'm such a bad person." "I'm dirty." "I'm unlovable," many things like that. And so being able to write this story that includes like what I was like as a kid before all that

happened, you know, with these kinds of positive memories as well and then what this person was like that was a part of my life before the abuse happened, like being able to kind of work that out and talk that through is helpful for a child to see, Oh this – this was not just this one thing. There's a story here. And that can be healing for a child to be able to tell that story in their own words. And the way that they remember it and have someone listen and witness that can be very [sic] healing experience.

Defense counsel raised the following objection to the "trauma narrative":

Judge, I would object to any narrative, that that would be bolstering, just a backdoor way of getting hearsay in front of this jury and further bolstering the complainant's testimony without the Defense having an opportunity to confront her regarding the inconsistencies.

Outside the presence of the jury, defense counsel reiterated these objections, and the prosecutor responded that the "trauma statement" was "for purposes of treatment" and "for healing of the child" and was not made for the "truth of the matter asserted." Instead, the prosecutor argued the statement was "going toward a medical diagnosis." The trial court asked if the "trauma narrative" was "the only page [defense counsel had] objection to," and defense counsel responded, "Yes." The trial court stated, "I have to agree this is testimonial in nature and under *Crawford* would say that you have a chance to cross examine the person. But you do have a chance to cross examine the person because she's here. Or was." Defense counsel responded that he "still argue[d] it's cumulative" and "bolstering" and "furthermore that the probative value of that information, since she's already testified, is clearly outweighed by the prejudicial effect." The trial court disagreed with defense counsel

–17–

and stated, "Given for therapeutic purposes, I'll allow it. Overrule your objection." Walley subsequently read K.M.'s "trauma narrative" to the jury.

Here, appellant first quotes the exchange during trial surrounding the admission of the "trauma narrative." Appellant asserts that the "trauma narrative" violates the Confrontation Clause of the United States Constitution and cites *Crawford v. Washington*, 541 U.S. 36 (2004). Appellant also asserts "the evidence was admitted under the guise of 'therapeutic purposes' not for medical diagnosis and 'immediate treatment'" and cites rule of evidence 803(4). Appellant's argument concludes as follows:

> This proffer was highly improper and prejudicial in an attempt to bolster the veracity of the in court testimony of the complainant. The trial court abused its discretion by erroneously allowing the evidence stating it was given for therapeutic purposes without even weighing its prejudicial effect greatly outweighed any possible probative value.

We note appellant does not further argue these issues in support of his fifth issue. Reading appellant's argument broadly, he appears to argue the "trauma narrative" was not admissible under an exception to the hearsay rule, violated the confrontation clause, was not admissible under rule of evidence 803(4), was an attempt to bolster K.M.'s testimony, and was more prejudicial than probative.

We review a trial court's rulings on the admissibility of evidence under an abuse of discretion standard, and will uphold the trial court's decision if it was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App.

–18–

2007). The erroneous admission of testimony is non-constitutional error that must be disregarded unless it affects the defendant's substantial rights. *See Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *see also* TEX. R. APP. P. 44.2(b).

We first address appellant's argument that the "trauma narrative" was more prejudicial than probative. Specifically, defense counsel objected at trial that "the probative value of that information, since [K.M.'s] already testified, is clearly outweighed by the prejudicial effect."

In determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice under rule of evidence 403, we consider "(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." TEX. R. EVID. 403; *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012).

Here, the "trauma narrative" was probative of K.M.'s process of treatment and the culmination of her efforts in therapy. K.M. had already testified in detail about the abuse, and the narrative had little potential to impress the jury in some irrational, yet indelible, way. The narrative was a short, one-page document set forth fully above, and the time needed to present the narrative was short. Finally, the narrative was useful to demonstrate K.M.'s participation in therapy and the consistency of her narrative. Under these circumstances, we conclude the trial court did not abuse its discretion in admitting the "trauma narrative" over appellant's objection that its

–19–

probative value was outweighed by its prejudicial effect. *See Hernandez*, 390 S.W.3d at 324; *Winegarner*, 235 S.W.3d at 790.

Further, even if we were to conclude the trial court erred in admitting K.M.'s "trauma narrative" for the other reasons urged by appellant, any such error was harmless because it did not affect appellant's substantial rights.

The erroneous admission of hearsay does not constitute reversible error "if other evidence proving the same fact is properly admitted elsewhere." *Lamerand v. State*, 540 S.W.3d 252, 256–57 (Tex. App. —Houston [1st Dist.] 2018, pet. ref'd) (quoting *Infante v. State*, 404 S.W.3d 656, 663 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (admission of inadmissible evidence becomes harmless error if other evidence proving the same fact is properly admitted elsewhere)).

Here, K.M. testified explicitly concerning most of the details in her "trauma narrative." To the extent K.M. did not testify concerning the aftermath of the abuse, this evidence came in elsewhere in the form of testimony from K.M.'s grandmother Helen. Helen testified K.M. was "fun-loving, had a lot of friends" prior to seventh grade. Helen gave the following description of K.M.'s demeanor at the time of trial:

> [K.M.] has become very quiet. She stays to herself. Very angry. She doesn't have hardly – she has maybe two friends that she associates with. She's very afraid of men. She is not the same child. She won't go anywhere by herself. She doesn't date. She stays close to her dad and her brother and me and her granny. This child is even afraid to go out to go buy groceries. Or she won't get her driver's license because she don't want to drive or go anywhere by herself. This is not the child that I had or I have raised.

To the extent appellant argues the trial court erred in admitting the "trauma narrative" because it did not come within an exception to the hearsay rule, constituted "bolstering," and was not admissible under rule 803(4) as a statement made for purposes of medical diagnosis or treatment, we conclude any such error was harmless. *See id.*

Under *Crawford*, the admission of a hearsay statement made by a non-testifying declarant violates the Sixth Amendment if the statement was testimonial, and the defendant lacked a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. Courts reviewing whether the error in admitting out-of-court statements in violation of *Crawford* is harmless beyond a reasonable doubt should consider:

(1) The importance of the hearsay statements to the State's case;

(2) Whether the hearsay evidence was cumulative of other evidence;

(3) The presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and

(4) The overall strength of the prosecution's case.

*Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006). Of course, courts may consider other factors as well, but, in the final analysis, the reviewing court must be convinced, beyond a reasonable doubt, that the admission of *Crawford*-barred testimony would probably not have had a significant impact on the mind of an average juror. *Id.* Put another way, is there a reasonable possibility that the *Crawford* error, within the context of the entire trial, "moved the jury from a state of

–21–

non-persuasion to one of persuasion" on a particular issue? *Id.* at 852–53 (quoting *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)).

Again, assuming without deciding the "trauma narrative" constituted "*Crawford*-barred testimony," we note the narrative consisted of a single page in a voluminous exhibit. The narrative mirrored extensive testimony by K.M. and her grandmother concerning the details of the abuse and the effects the abuse had on K.M. Because K.M.'s testimony alone was sufficient to establish appellant's guilt, the trauma narrative was not important to the State's case. Similarly, because of the clarity and specificity of K.M.'s testimony, the State's case against appellant was very strong. Under these circumstances, we are convinced the admission of the "trauma narrative" would probably not have had a significant impact on the mind of an average juror. *Id.* We overrule appellant's fifth point of error.

In his sixth issue, appellant argues the trial court erred in overruling his objection to prejudicial hearsay proffered by the State to bolster M.E.'s testimony. Specifically, appellant complains the trial court erred in permitting appellant's wife to testify, over appellant's hearsay objection, that M.E. told her appellant said "'Do you want to play a game?' and [appellant] had said that it was just a game that he and her could play. And she said that he asked her if she wanted to try some food." Again, the record shows M.E. testified in great detail to the same facts without objection. Accordingly, any error in admitting the testimony concerning these

–22–

general details of the "game" appellant played with M.E. was cured. *Lane*, 151 S.W.3d at 193. We overrule appellant's sixth issue.

In his seventh issue, appellant argues penal code section 21.02 is unconstitutional because it does not require jurors to be unanimous as to which specific acts of child abuse were committed. In his eighth issue, appellant argues penal code section 21.02(b) and government code section 508.145(a) are unconstitutional as violative of the prohibition against cruel and unusual punishment and the guarantee of equal protection.

The entirety of appellant's argument under these issues, which appellant presents together, is as follows:

> Appellant recognizes that this issue has previously been held constitutional by many courts of appeal in Texas. However, Appellant seeks to preserve this issue for any future review by the Texas Court of Criminal Appeals and or any Federal Court. Appellant adopts by reference Appellant's arguments and authorities presented in the case of *Mele v. State*, 2018 WL 650 5948 [sic] (Tex. Ct. App. Ft. Worth, 02-18-00185-CR decided December 13, 2018; and *Long v. State*, 2018 W, 2018 L 3581008 (Tex. Ct. App. Ft. Worth, 02-17-00406-CR and 02-17-00407-CR decided July 18, 2018. See also *Love v. State*, 2018 WL 400807 (Tex. Ct. App. – Corpus Christi, 13-16-00552-CR decided January 18, 2018.

Appellant raises no supporting arguments in his seventh and eighth issues. We note appellant did not raise these issues at trial. A defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute. *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009). We overrule appellant's seventh and eighth issues.

–23–

We affirm the trial court's judgment.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

190768F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

GORDON ALAN KIRK, Appellant

No. 05-19-00768-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas Trial Court Cause No. F-1541871-M. Opinion delivered by Chief Justice Burns. Justices Pedersen, III and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered September 28, 2020