

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-13-00553-CR
## NO. 02-13-00554-CR

TYWRON PIERRE THOMAS A/K/A                                    APPELLANT
TYRONE PIERRE THOMAS

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY
TRIAL COURT NOS. 1038600W, 1195093D

----------

## OPINION

----------

In cause number 1195093D, a jury convicted Appellant Tywron Pierre Thomas, also known as Tyrone Pierre Thomas, of committing capital murder by shooting Daniel Rojas with a firearm in the course of committing robbery at a Valero gas station. The trial court sentenced Appellant to a mandatory life sentence. In cause number 1038600W, the trial court found the allegations in

the State's motion to proceed to adjudication of the offense of burglary to be true, revoked Appellant's deferred adjudication community supervision, adjudicated his guilt of burglary, and sentenced him to twenty years' confinement.

Appellant brings three issues on appeal, arguing that the trial court reversibly erred by

- refusing to strike Chance Smith's direct-examination testimony when he invoked the Fifth Amendment in response to questions on cross-examination;

- failing to give a limiting instruction regarding a transcript and allowing the State to introduce the transcript as substantive evidence; and

- overruling the defense's motion for mistrial premised on the State's misconduct in closing argument.

Because the trial court committed no reversible error, we affirm the trial court's judgments.

**Brief Summary of Facts**

At approximately 6:20 a.m. on March 23, 2010, Daniel Rojas arrived at the Valero gas station and convenience store where he worked. He and Jerry Burnett, a Mrs. Baird's representative who regularly stocked the store with Mrs. Baird's bakery products, arrived at about the same time. As Rojas was going about his duties to open the store and Burnett was stocking the bread shelves, three masked men entered the store. Two of them had guns, and the third man was carrying a red gas can. The first masked gunman raised his gun and shot Burnett while walking past the bread aisle. The second gunman followed behind

2

the first gunman, while the third masked man barricaded the door with a newspaper stand.

The two gunmen moved quickly to the back room and found Rojas there. The video evidence shows Rojas at gunpoint, opening the store's freezer, taking out a dark object (presumably containing money), and handing it to the gunmen. The gunmen then forced Rojas out of the back room and shoved him to the registers out front. Rojas opened the registers, and the second gunman emptied their contents into a dark bag he was carrying. The two gunmen took Rojas back to the back room, and the first gunman shot Rojas in the head. The gunmen fled the back room and met the third masked man at the store's front door. The third man poured gasoline on the floor from the gas can he carried. The three men then left the store.

A customer drove up while the three men were running out of the store, and he stood as though surprised until the first gunman raised his gun to shoot. When the customer heard the gun click, he began running down the street, but he managed to see the masked men get into a hatchback car and leave the Valero. He believed that the man with the gas can was Hispanic because he thought that he saw light skin around the man's eyes. Appellant is dark-skinned.

Chance Smith was an accomplice in the robbery, but he was not one of the three masked men. Instead, he served as a lookout, sitting across the street from the Valero station and watching for police. He was the State's primary witness at trial. He testified that while technically his mother was a part-owner

3

with Kwame Rockwell of Moncomp, a car lot adjacent to the Valero station, he considered himself an owner. Smith said that Rockwell had been the first gunman. Smith testified that in January 2010 the car lot business was doing very poorly, and that he, Rockwell, and Randy Seibel, the second gunman, had tried unsuccessfully to find legitimate means to get funds to keep the business going. They knew that the Valero station was doing well because either two of them or all three had cashed large tax refund checks at the station. From this knowledge, they surmised that Vo, the Valero's owner, kept a large amount of cash there.

Smith described various times that the three had tried to rob Vo before the March 23 robbery. Smith admitted that Appellant had not been involved in any of these attempts on Vo and that Appellant had nothing to do with the car lot business. But Smith also testified that Appellant was the gas-can-carrying third masked man in the March 23 robbery. Smith stated that Appellant and his cousin, Tim Thomas, were recruited to participate in the robbery shortly before March 23.

Appellant also testified at trial. He had given a statement to authorities in which he admitted that he had been the third masked man who carried the gas can, but at trial he testified that he had inculpated himself in the robbery to cover for his cousin Tim, who was light-skinned. Appellant testified that he had actually been the lookout and that Tim had been the third masked man who carried the gas can into the Valero store.

4

**Partial Denial of Cross-Examination**

In his first issue, Appellant argues that the trial court reversibly erred and denied him effective assistance of counsel by refusing to strike Smith's direct-examination testimony when he invoked the Fifth Amendment in response to questions on cross-examination. The law is well established that a witness may not voluntarily testify regarding a matter but then invoke his Fifth Amendment right to remain silent to avoid answering further questions about that matter. "It is clearly inadmissible to permit a witness to give a partial account of his knowledge of the transaction, suppressing other of the circumstances, whether the evidence is to be used in favor of or against the [S]tate."[1]

On direct examination and as part of an agreement with the State, Smith testified to the details of the robbery and murder of Rojas and to the development of the plan to commit the robbery. Smith testified that the business had needed an influx of cash and that he and Rockwell had developed several ideas for getting money in the early part of the year before the robberies. Smith admitted that some of the ideas were not "legit" and that some were scandalous. Smith also testified that he had cashed a large income tax check at the Valero station and that Rockwell and Seibel had also both cashed IRS checks there. Then he said that just he and Seibel had. When Appellant's trial counsel attempted to ask

---

[1] *Ex parte Park*, 37 Tex. Crim. 590, 596–97, 40 S.W. 300, 302 (1897).

additional questions about the cashing of the IRS checks, Smith requested to speak to his lawyer.

The conscientious trial judge recessed the proceedings until Smith's attorney could be contacted. Smith's attorney came to the trial court, conferred with Smith, and presented argument to the trial court regarding Smith's right not to answer further questions about the scheme. After Appellant's counsel argued that the State had opened the door, the trial judge allowed Appellant's counsel to delve into the topic, but only about the time period near the time of the Valero robbery. Appellant's counsel explained that she was trying to elicit evidence that "they had an IRS scam that they were using to scramble to get $4,000 to pay the rent. They were using this scam to pay the rent." When she questioned Smith about the scheme, he invoked his Fifth Amendment privilege against self-incrimination. Appellant's counsel then requested a mistrial on the basis of denial of "full and fair cross-examination." The trial court denied her request.

On redirect, the State asked further questions about the scheme's relationship to the March 23 robbery and murder, and Smith voluntarily answered them. Smith initially testified that his cashing of the IRS check had no role in the scheme to rob the store but then admitted that it helped develop the robbery plan. Smith explained that he, Rockwell, and Seibel had become aware that there were large amounts of cash at the Valero station when either all or two of them had been able to cash large tax refund checks there along with other people. Through skillful cross-examination, Appellant's counsel was then able to

6

elicit the information Smith had announced that he would not reveal when he invoked his Fifth Amendment protection, that is, that the tax refund checks were part of a scam against the IRS.

At a jury break, Appellant's counsel perfected error on the record by asking the trial judge to instruct Smith to answer questions regarding the IRS and receiving a denial because of Smith's invocation of his Fifth Amendment privilege. She then asked the trial court to strike Smith's testimony because she was precluded from cross-examining Smith on his testimony about the scheme by his invocation of his Fifth Amendment privilege. Upon the denial of her request, she complained that the trial court had denied Appellant "his rights under the state and federal constitution of due process and to confront and cross-examine the witnesses that have been tendered against him."

This case is unusual because Smith's refusal to testify about the scheme on cross-examination did not prevent Appellant's trial counsel from questioning Smith about the scheme. She got the information she wanted before the jury: Smith cheated the government. Even if it was constitutional error to refuse to strike Smith's testimony, which we do not hold, in light of Appellant's ability to secure the relevant evidence of tax fraud while Smith simultaneously reiterated

7

his refusal to answer those questions, such error was harmless beyond a reasonable doubt.[2] We overrule Appellant's first issue.

**Limiting Instruction for Transcript**

Appellant argues in his second issue that the trial court reversibly erred by admitting as substantive evidence a transcript of the CD containing his interview with the police, played to the jury as State's Exhibit 308, and by failing to give a limiting instruction regarding the transcript. But we find no indication in the record that the transcript was admitted into evidence or that the jury was provided a copy of the transcript. Additionally, the record indicates that the trial court denied the State's request to allow the jury to see the transcript:

> [PROSECUTOR]: I know you made a ruling about the transcript, could I bring just one matter to the Court's attention?
>
> THE COURT: Yes.
>
> [PROSECUTOR]: Judge, back in the case of Garrett versus State, which is a case out of the Court of Criminal Appeals back in 1983, 658 S.W.2d 592. In that case, the Court introduced the State's transcript over defense appeal. And the Court basically said that the fact that the Court only made the transcript available while the jury was listening to it, didn't enter it into evidence, and, you know, took the transcripts up—
>
> THE COURT: I'm familiar with the case.
>
> [PROSECUTOR]: Okay. And, basically, the instruction that we prepared is basically the instruction that the Court approved in

---

[2]*See* Tex. R. App. P. 44.2(a); *Davis v. State*, 203 S.W.3d 845, 849–53 (Tex. Crim. App. 2006) (discussing harmless error framework from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967)), *cert. denied*, 549 U.S. 1344 (2007).

Garrett versus State. So with that additional consideration, we would just ask that the jury be allowed to use the transcript as an aid as they listen to the recording in court.

THE COURT: You have the same objection?

[DEFENSE]: I do, Judge.

THE COURT: You're overruled.

As the CD played, the prosecutor repeatedly asked the sponsoring witness what was being said on the recording. The witness and prosecutor appeared to have the transcript, but various comments on the record indicate that the jury did not. The trial judge stated that he was familiar with the law governing the admission of transcripts and was aware of the required jury instruction. Absence of direct proof that the transcript was admitted as an exhibit, the repeated requests for the witness to explain what was being said in the recording, and the absence of the jury instruction all indicate that the transcript was never admitted before the jury.

Because there is no record that the transcript was made available to the jury,[3] we cannot hold that the trial court abused its discretion by admitting said

---

[3]*See* Tex. R. App. P. 33.1(a); *New v. State*, No. 02-03-00506-CR, 2005 WL 248526, at *3 (Tex. App.—Fort Worth Feb. 3, 2005, pet. ref'd) (not designated for publication) (holding "error, if any, was not preserved" regarding questions proposed at bench conference but disallowed "because the record does not reveal what was said at the bench"); *Hullaby v. State*, 911 S.W.2d 921, 926 (Tex. App—Fort Worth 1995, pet. ref'd) (holding unrecorded objection made at bench did not preserve error regarding admission of evidence).

transcript or that the trial court erred by failing to instruct the jury regarding the transcript. We overrule Appellant's second issue.

**Improper Jury Argument**

In his third issue, Appellant argues that the trial court abused its discretion by denying his motion for mistrial after sustaining his objection to the prosecutor's closing argument and instructing the jury to disregard the remark. Appellant asserts that the prosecutor's argument, "Sweet deals, secret deals? I cannot speak for what kind of prosecutor [defense counsel] was when she was in this office, but I don't lie to juries," was "manifestly improper" because "it directly accused defense counsel of lying to the jury" and "indirectly accused her of proffering perjured testimony."

Although a prosecutor is permitted to attack the argument of defense counsel, he cannot attack counsel's personal integrity.[4] When a trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for mistrial, the issue is whether the trial court abused its discretion in denying the mistrial.[5] Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, that is, so prejudicial that expenditure of

---

[4]*See Mosley v. State*, 983 S.W.2d 249, 258–59 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999); *Whitney v. State*, 396 S.W.3d 696, 704 (Tex. App.—Fort Worth 2013, pet. ref'd).

[5]*Archie v. State*, 340 S.W.3d 734, 738–40 (Tex. Crim. App. 2011); *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Whitney*, 396 S.W.3d at 703.

further time and expense would be wasteful and futile, will a mistrial be required.[6]

In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of conviction absent the misconduct.[7]

An instruction to disregard an improper jury argument is generally sufficient to cure harm.[8] On appeal, a reviewing court presumes that the jury followed the trial court's instruction in the manner presented.[9] Although the presumption is refutable, the defendant must rebut the presumption by pointing to evidence that the jury failed to follow the trial court's instruction.[10]

The argument did not inject new facts harmful to Appellant, nor did the prosecutor continue in his attack. Indeed, his attack appears to be in response to defense counsel's jury argument:

---

[6]*Hawkins*, 135 S.W.3d at 77 (internal quotation marks and citation omitted); *Whitney*, 396 S.W.3d 704 (quoting *Hawkins*); *see also Archie*, 340 S.W.3d at 739 (noting mistrial appropriate when the objectionable events "are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant" (internal quotation marks and citation omitted)).

[7]*Hawkins*, 135 S.W.3d at 77; *Mosley*, 983 S.W.2d at 259.

[8]*Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001); *Whitney*, 396 S.W.3d at 704.

[9]*Archie*, 340 S.W.3d at 741; *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Whitney*, 396 S.W.3d at 706.

[10]*Thrift*, 176 S.W.3d at 224.

11

And they now stand up in front of you and tell—I want to see them say it with a straight face again. I've seen them do it several times during this trial. But there is no deal. There is no deal about any of those prior felonies. All those first-degree felonies, those aggravated robberies, those attempted robberies, [Smith] is just up here testifying and there's absolutely no deal. That's not part of the deal. Huh-uh. No, it's not.

That's what they say. That's simply not the truth. And you know it because it's actually [Smith] that told you, I think there's like this wink-wink, nod-nod underhanded thing. . . . No. No, sir, there's not. There's none of that. Okay.

. . . .

So you know there's a deal that goes beyond what these gentlem[e]n are willing to stand up and tell you. There's shady dealings here. And our government should be above that. If we are going to trust in our government as citizens, if we're going to trust in them, if we're going to throw somebody in prison for the rest of their life with no possibility of parole, they need to come to this courtroom with clean hands. They need to come here telling the truth and being above-board. And that simply has not happened.

After the trial court sustained Appellant's objection to the State's jury argument and instructed the jury to disregard it, the State did not continue to attack defense counsel but, instead, argued,

And I'll ask you folks to disregard her telling you that I made a secret deal with the Defendant and lied to you people about that. I'll ask you to disregard that because there's no basis in fact. I can't even imagine where she would come up with something like that, but there's nothing present in the case to support it. Nothing at all.

I don't make—I don't make promises—I don't make promises about cases that I have no jurisdiction over, okay?

The trial court's curative measures were sufficient to cure any harm resulting from the improper argument. After sustaining Appellant's objection to the argument, the trial court immediately admonished the jury: "You will disregard

12

the last comment." Although Appellant argues that the trial court's admonition was insufficient, Appellant did not offer an additional or alternatively-worded instruction. Nor did he request further instruction.[11]

Applying the appropriate balancing test and standard of review, we hold that the trial court's instruction cured any harm from the improper argument and that the trial court did not abuse its discretion by denying Appellant's motion for mistrial. We overrule Appellant's third issue.

**Conclusion**

Having overruled Appellant's three issues on appeal, we affirm the trial court's judgment in the capital murder case. Further, although Appellant does not specifically direct us to any complaint regarding the trial court's proceeding to adjudication in Cause No. 1038600W, to the extent that his complaints regarding the capital murder case are intended to also apply to the trial court's actions in the burglary case, we overrule his challenge, if any, to the judgment in that cause and likewise affirm the trial court's judgment in the burglary case.

---

[11]*See Waldo v. State*, 746 S.W.2d 750, 756 (Tex. Crim. App. 1988) (holding trial court's instruction "adequate" when defendant "failed to request a sharper 'rebuke' before moving for a mistrial").

                                        /s/ Lee Ann Dauphinot
                                        LEE ANN DAUPHINOT
                                        JUSTICE

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

PUBLISH

DELIVERED:  March 26, 2015